## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **KEVIN KEITH** | : Case No. |
| **#295-769** | : |
| **Marion Correctional Institution** | : **Judge** |
| **P. O. Box 57** | : |
| **940 Marion-Williamsport Road** | : **Magistrate Judge** |
| **Marion, Ohio 43302** | : |
| | : |
| **Plaintiff,** | : **COMPLAINT AND JURY** |
| | : **DEMAND** |
| **v.** | : |
| | : |
| **G. MICHELE YEZZO** | : |
| **614 Hillsdale Drive #244** | : |
| **West Jefferson, Ohio 43162** | : |
| *In her individual and official capacity* | : |
| | : |
| **And** | : |
| | : |
| **DANIEL CAPPY** | : |
| **220 Woodedge Circle East** | : |
| **Powell, OH 43065** | : |
| *In his individual and official capacity* | : |
| | : |
| | : |
| **And** | : |
| | : |
| **JOHN LENHART** | : |
| *c/o* **Shelby County Sheriff Office** | : |
| **555 Gearhart Road** | : |
| **Sidney, Ohio 45365** | : |
| *In his individual and official capacity* | :                                          : |
| | : |
| **And** | : |
| | : |
| **MICHAEL CORWIN** | : |
| **570 Kaler Ave** | : |
| **Bucyrus, OH 44820** | : |
| *In his individual and official capacity* | : |
| | : |
| | : |

And                                           :
                                              :
**CITY OF BUCYRUS**                           :
**c/o Bucyrus Law Director**                  :
**500 S. Sandusky Avenue**                    :
**Bucyrus, Ohio 44820**                       :
                                              :
And                                           :
                                              :
**BUCYRUS POLICE DEPARTMENT**                 :
**500 S. Sandusky Avenue**                    :
**Bucyrus, Ohio 44820**                       :
                                              :
And                                           :
                                              :
**CRAWFORD COUNTY PROSECUTOR'S**              :
**OFFICE**                                    :
**112 E. Mansfield Street, Suite 305**        :
**Bucyrus, OH 44820**                         :
                                              :
And                                           :
                                              :
**MATTHEW CRALL**                             :
**c/o Crawford County Prosecutor**            :
**112 E. Mansfield Street, Suite 305**        :
**Bucyrus, OH 44820**                         :
*In his individual and official capacity*     :
                                              :
And                                           :
                                              :
**OHIO BUREAU OF CRIMINAL**                   :
**INVESTIGATION**                             :
**1560 OH-56**                                :
**London, OH 43140**                          :
                                              :
And                                           :
                                              :
**OHIO ATTORNEY GENERAL**                     :
**MIKE DEWINE**                               :
**30 E. Broad Street**                        :
**Columbus, OH 43215**                        :
*In his individual and official capacity*     :
                                              :
             **Defendants.**

2

# I.    INTRODUCTION

1. Kevin Keith has been incarcerated for almost 24 years for a crime he did not

   commit. The Defendants, acting under color of state law, deprived Keith of

   evidence that he could have used to demonstrate his entitlement to a new trial.

   The key forensic evidence against Keith was provided by G. Michele Yezzo, but

   Keith was not informed that Defendant Yezzo was known to Defendant Bureau

   of Criminal Investigation (BCI) as an analyst who would "stretch the truth to

   satisfy" law enforcement.  Despite knowing that Yezzo was violating the

   constitutional rights of criminal defendants, BCI, Cappy, and Lenhart permitted

   Yezzo to render critical conclusions in Keith's case.  The State did not inform

   Keith about Yezzo, her biases, and what it knew to be her work practices at any

   point during the time Keith could timely raise the issue in his allotted appeals.

   It did not inform Keith about Yezzo's biases and reputation at any point during

   which he could hire an expert to review Yezzo's work and then raise a timely

   claim demonstrating that her bias affected her testimony.  This exculpatory

   evidence—and more—was suppressed from Keith until he discovered it in 2016.

   Then, Defendants Crall and DeWine relied on strict procedural defenses to

   successfully prevent Keith from having a court consider his *Brady* claim on the

   merits.

2. Defendant Bucyrus Police Department, Corwin, and City of Bucyrus also

   concealed from Keith the evidence demonstrating that the Bucyrus Police

   Department ignored a defense subpoena issued at the time of Keith's trial.

3

Keith's 2010 new trial motion was dismissed in part because Keith did not establish "bad faith" on the part of the police to meet the requirements under *Arizona v. Youngblood*. In response to a 2017 public records request, the Defendants Bucyrus Police Department, Corwin, and City of Bucyrus finally disclosed to Keith evidence that demonstrated the department's bad faith.

3. The Defendants' actions have resulted in Keith's inability to have the evidence heard on the merits. He brings this civil rights action to obtain some effective vindication of his right to access to the courts; to have the forensic evidence re-evaluated, fairly; and to discourage these and similar Defendants from such blatant constitutional violations in the future.

## II.  JURISDICTION

4. Jurisdiction over claims brought under the Civil Rights Act of 1871 is conferred on this Court by 28 U.S.C. §§1331, 1343 (3) and (4). Jurisdiction over state law claims is conferred by 28 U.S.C. § 1367(a). Venue is proper in this Division.

## III.  PARTIES

5. Kevin Keith is the original defendant in *State v. Kevin Keith*. He brings this suit individually.

6. Defendant G. Michele Yezzo (hereafter Yezzo) was at all times relevant to this Complaint a forensic scientist employed by the State of Ohio until she retired in 2009. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. She is sued in her individual and official capacity.

4

7. Defendant Daniel Cappy was at all times relevant to this Complaint the Laboratory Director at the Ohio Attorney General's Bureau of Criminal Investigation employed by the State of Ohio. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacity.

8. Defendant John Lenhart was at all times relevant to this Complaint the Superintendent at the Ohio Attorney General's Bureau of Criminal Investigation employed by the State of Ohio. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is being sued in his individual and official capacity.

9. Defendant Michael Corwin was at all times relevant to this Complaint a police officer employed by the Bucyrus, Ohio Police Department. Defendant is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacity.

10. Defendant City of Bucyrus, Ohio is a municipal corporation organized under the laws of the State of Ohio.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

11. Defendant Bucyrus Police Department is a local police department organized under the laws of the State of Ohio. The department is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law.

5

12. Defendant Crawford County Prosecutor's Office is a municipal corporation organized under the laws of the State of Ohio.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

13. Defendant Prosecutor Matthew Crall is the Crawford County Prosecutor. He is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacities.

14. Defendant Bureau of Criminal Investigations ("BCI") is a forensic laboratory organized under the Office of the Attorney General of the State of Ohio. BCI is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law.

15. Defendant Attorney General Mike DeWine was at all times relevant to this Complaint the Ohio Attorney General and chief legal and law enforcement officer of the State of Ohio. He is a "person" under 42 U.S.C. §1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacities.

## IV.    FACTS

**A. Six people are shot in Bucyrus, Ohio, and Kevin Keith is blamed.**

16. On February 13, 1994, a gunman entered a Bucyrus Estates apartment, shooting six people and killing three of them: Marichell Chatman, Linda Chatman, and Marchae Chatman.  The surviving victims were Richard Warren, Quanita Reeves, and Quentin Reeves.

17. Warren told four witnesses immediately following the shooting that he did not know who shot him. Three of those witnesses recalled that Warren specifically noted that the gunman was wearing a mask.

18. An eyewitness claimed to the police that she saw the perpetrator run from the apartment to a white/light yellow/cream-colored car, and while he was attempting to get away, he temporarily got his car stuck in a snowbank before he sped off.

19. Based on this, the police took tire and license plate impressions from the snowbank.

20. The officers determined that the partial license plate in the snow was "043."

21. Bystanders reported to police that they had seen a large black male around Bucyrus Estates that night.

22. Kevin Keith is a large black male.

23. Warren told the police the day following the shooting that he recalled the shooter's name was "Kevin," and he picked Keith's face out of a lineup.

24. Weeks after Keith's arrest, police learned that the large black male referenced by the bystanders was not Keith, but was instead a new tenant who had not been recognized as familiar.

**B. Keith is arrested, and Defendants Corwin/City of Bucyrus/Bucyrus Police Department asked Defendant Yezzo to test the evidence to confirm the forensic conclusion they wanted.**

25. On February 15, 1994, police arrested Keith and charged him with three counts of aggravated murder for a shooting that took place two days earlier.

26. Three days later, while recovering in the hospital, Quanita Reeves told her nurse and then the Detectives that it was her "Daddy's friend, Bruce" who shot them. Exs. 1, 2.

27. Keith provided an alibi for the time of the shootings, which was corroborated by multiple people.

28. Shortly after Keith's arrest, the Chief of Bucyrus Police Department held a press conference wherein he referenced carpet fibers, shoe prints, and shoes that had been collected as evidence and submitted to BCI for testing.

29. The Chief of Police stated at the press conference, "I don't want to say that we've made an arrest and now we're going to make the case, but we're still very interested in putting a lot of this evidence together."

30. The Chief further stated, "What we have is some evidence that we have collected that we *hope* we will be able to link him to the crimes."

31. None of that evidence linked Keith to the crime scene or the car.

32. Officers received a printout of the cars in Crawford and Richland Counties that contained "043" in the license plate several weeks after Keith was arrested and twelve days before Yezzo issued her report.

33. On March 5, 1994, the police impounded a blue/green car driven by Keith's girlfriend Melanie Davison because it had the license plate number of "MVR043."  The car belonged to Davison's grandfather, Alton Davison.

34. Bucyrus Police Officers viewed Davison's car and determined that it appeared to match up in conjunction with the snow impression left at the scene despite that the car was a different color from the eyewitness account.

35. The tire-track impressions collected from the scene did not match the tires on Davison's car when it was impounded.

36. On March 9, 1994, Captain Corwin of the Bucyrus Police Department faxed Yezzo a receipt for the type of tires purchased by Davison the previous year, along with a brochure picture of the tires. Ex. 3, pp. 2-4.

37. Corwin directed Yezzo to which tire picture represented the tires Davison put on the car. He included a handwritten note with the tire brochure, dated March 11, 1994, that said, "hope this will do the trick for us." Ex. 3, p. 5.

38. Five days later, Yezzo concluded that the tires in the brochure picture were similar to the tire tracks at the scene.  Yezzo never physically examined any tire.

39. The Bucyrus Police Department provided Yezzo with photographs of the license plate from the impounded car to test against photos of the license plate impression in the snow.

40. Yezzo further concluded that the license plate impression in the snow had "spacing and orientation similar to the license plate 'MVR043' on the vehicle submitted as item #E1," Davison's car.

41. Yezzo testified to these conclusions via deposition two weeks before BCI held a follow-up pre-disciplinary hearing that was scheduled after she was put on leave in June 1993. Ohio's Criminal Rules allow for a witness's testimony "be taken by

9

deposition" only when that witness is unavailable at trial and when his "testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice." Crim. R. 15(A).  Yezzo's deposition testimony was admitted as evidence in the trial as part of the prosecution's case in chief.

42. At Keith's trial, the eyewitness to the shooter's getaway car testified that the car she saw speeding away from the crime scene was a cream, light yellow color.  Ex. 4.  Davison's car was blue/green, but the police disregarded that inconsistency with the witness's testimony. Ex. 5.

43. The police disregarded evidence against a person who should have been a more likely suspect based on Yezzo's opinion that the snow impression at the scene fit the spacing and orientation of Davison's plate and bumper.

44. That other suspect, Rodney Melton, had the same motive for the killings that Keith was accused of having—retaliation against the police informant who led to his arrest for drug sales. The police and prosecution, however, withheld this from Keith at the time of his trial.

45. Unlike Keith, Melton also was a convicted killer; had "spread the word that anybody that snitches on [him and his brother Bruce] would be killed;" and Melton had told a woman two weeks before the shootings that "he had been paid $15,000 to cripple 'the man' who was responsible for the [drug] raids in Crestline, Ohio last week." Ex. 6, p. 8, 11. The police and prosecution withheld this evidence (aside from Melton's criminal conviction) from Keith at the time of his trial.

46. Melton's own brother, Bruce Melton, told police that Melton may have been paid to commit the shootings.  Ex. 7, p. 16. The police and prosecution, however, withheld this from Keith at the time of his trial.

47. Rodney and Bruce Melton were always together and were a part of the same criminal enterprise with Demetrius Reeves, the father of surviving victims Quanita and Quentin Reeves.  *See* ¶25 (Quanita had reported to her nurse and Detectives that the shooter was her "Daddy's friend, Bruce.")

48. In addition to that and other evidence incriminating Melton, a confidential informant told police that Melton insisted on using his Chevy Impala "with a new yellow paint job" in his criminal transactions.  The police and prosecution, however, withheld this from Keith at the time of his trial. The license plates that were registered to Melton's light yellow Impala were JKL218 and 043LIJ. Ex. 6, p. 31.

49. Police used Yezzo's forensic conclusions to refute questions at trial on cross-examination about Melton and his car.

50. When asked why Melton's car was not investigated as the killer's car, the Detectives relied on Yezzo's findings about the spacing and orientation of Davison's license plate to say that Melton's car was excluded.

**C. Keith challenged that the police improperly influenced Warren to have him recall the name "Kevin" and "Keith," and the police and prosecutor refuted that by demonstrating Warren told his nurse the name was "Kevin."**

51. On May 12, 1994, the court held a hearing regarding a motion to compel and motions to suppress filed by Keith. Keith challenged Warren's identification of the name "Kevin" and "Keith" as suggested to the witness by the police.

52. Captain John Stanley testified that it was Warren's nurse Amy Gimmets who originally told him that Warren said the shooter's name was "Kevin." He testified that he then called Warren back and gave him a name lineup of four last names, and Warren picked "Keith."

53. Keith's attorney cross-examined Captain Stanley about the police station's phone system and how calls are recorded, and he challenged Captain Stanley about why there was no recording of the second call.

54. Keith moved the court to suppress testimony about the name, because of the unreliability, but the court denied it.

55. Keith's attorney issued a subpoena that same day to the Custodian of Records of the Bucyrus Police Department for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time."

56. Captain Stanley then testified at Keith's trial that he first heard the name "Kevin" used by Warren's nurse Amy Gimmets in his phone conversation with her.

57. The prosecution then presented the testimony of John Foor, the registered nurse who was assigned to Warren immediately after his surgeries on the night of the shooting and into the morning.  Foor testified that he asked Warren who shot him, and Warren wrote down the name "Kevin."

58. Foor testified that it was written on a piece of scrap paper and he did not keep it.

59. Foor testified that he called the police around 5:00 a.m. on February 14, 1994 to report this.

60. Warren testified that he did not write anything down when he came out of surgery, because his hands were strapped down.

**D. In the years following his conviction, Keith attempted to obtain the Bucyrus Police Department's phone records or evidence documenting the calls from Warren's nurse.**

61. Keith repeatedly questioned whether the State provided truthful information about the way in which Warren came to recall the name "Kevin."

62. Keith submitted public records requests to obtain evidence of phone calls between the police and Foor, but Defendant Bucyrus Police Department told him that call logs did not exist and recordings were destroyed. Ex. 8.

63. In an unrelated lawsuit, Edwin Davila sued the Bucyrus Police Department for its failure to provide the 911 calls he had requested via public records request, and the Defendant City of Bucyrus provided Davila with their radio dispatch logs as an index of the station's phone calls.

64. In February 2010, Keith obtained the Bucyrus Police Department's radio dispatch logs covering the relevant time period and learned that the radio logs showed no call from Warren's nurses.  Ex. 9.

65. On May 11, 2010, Keith filed for legal relief on the basis that the logs demonstrated violations under *Brady v. Maryland*, as well as under *Arizona v. Youngblood* because the calls/records of calls were destroyed.

13

66. The Crawford County Prosecutor opposed Keith's motion, arguing in part that it was Keith's fault for failing to obtain the evidence, and stated that Keith failed to establish bad faith.

67. Defendants Bucyrus Police Department, Corwin, and City of Bucyrus had actual knowledge that the Bucyrus Police Department's files contained additional evidence, still suppressed from Keith at that point, that demonstrated the Department's bad faith.

68. Defendants Bucyrus Police Department, Corwin, and City of Bucyrus had actual knowledge that the Bucyrus Police Department's files contained the May 12, 1994 subpoena to the Bucyrus Police Department for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time," and that Defendant Corwin and/or another member of Defendant Bucyrus Police Department had written the words "Ignore For Now."  Ex. 10.

69. The courts denied Keith legal relief, in part because he did not establish bad faith.

70. It was not until Keith obtained public records from the Defendant Bucyrus Police Department on February 2, 2017, that he obtained Defendant's copy of the May 12, 1994 subpoena, which demonstrated they ignored the subpoena and later destroyed the evidence.

71. Because Defendants Bucyrus Police Department, Corwin, and City of Bucyrus suppressed this handwriting on the subpoena, Keith was unable to present it to the courts as evidence of Defendants' bad faith.

**E. Defendants BCI, Cappy, and Lenhart suppressed the exculpatory information about Yezzo and permitted her to continue working with BCI.**

72. Defendants BCI, Cappy, and Lenhart never turned over Yezzo's personnel file or informed Keith or his counsel about Yezzo's reputation for untrustworthiness.

73. Keith did not learn of any of this information regarding Yezzo's reputation, misconduct, and mental instability until after the Cleveland Plain Dealer ran an article about James Parsons and what his counsel had learned about Yezzo. That article was dated January 8, 2016, and Keith obtained Yezzo's personnel file from Parsons' counsel in the days immediately following the article.

74. Defendant Yezzo's duties included the testing and analysis of forensic evidence provided to her by local police departments as part of criminal investigations.

75. In 1989, five years prior to Keith's arrest and conviction, the assistant superintendent of BCI sent a memorandum to the superintendent that detailed serious concerns regarding Yezzo.

76. The memo stated that colleagues requested Yezzo undergo a medical examination due to the "consensus of opinion…that [Yezzo] suffers a severe mental imbalance and needs immediate assistance." Ex. 11, p.1.

77. These issues were severe enough that Yezzo's colleagues requested that "she be relieved of all training responsibilities, remov[ed] from the Laboratory Section, and relieved of speaking engagements," a recognition that Yezzo's mental instability affected her work. Ex. 11, p. 1.

78. BCI documented concerns regarding Yezzo's behavior for several years before this 1989 memorandum.

79. The memo details the concern that a fellow employee may have resigned due to "management's lack of action" against Yezzo, and further notes the union's belief that "management [is] ineffective and unconcerned in controlling" Yezzo. Ex. 11, p. 2.

80. This 1989 memo states plainly the concern that Yezzo's "findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." Ex. 11, p. 2.

81. In 1993, analysts rechecking her work questioned her conclusions, specifically on a blood analysis and a partial footprint analysis. Ex. 12, p. 12.  BCI again documented that Yezzo had a "reputation of giving dept. answer wants if stroke her." *Id.*

82. These feelings were held by employees in all the laboratories under BCI control, and union members said that Yezzo's behavior caused everyone's work effort to suffer. Ex. 11, p. 3.

83. In addition to volatile behavior and a questioned work ethic, Yezzo used racial slurs ("nigger bitch", "nigger in the woodpile") when addressing an African American co-worker. Ex. 13, p. 5, 7.

84. Keith is an African-American.

85. BCI placed Yezzo on administrative leave in June of 1993 pending an investigation into threats she made and ordered Yezzo to undergo a medical evaluation. Ex. 12, p. 1.

86. In August of 1993, BCI noted that Yezzo couldn't "substantially perform her job duties [without first] seeking counseling" because of "mental disability." Ex. 12, p. 5.

87. BCI "offered [Yezzo] the accommodation of taking a disability leave to seek the treatment w[ith] ability to r[eturn] to work as soon as Dr. deemed fit." Ex. 12, p. 5.

88. Alternatively, the notes indicate that BCI would have to "disability SEP" Yezzo "since she was not capable of performing her duties." Ex. 12, p. 5.

89. Defendant Lenhart believed Yezzo "was gone" from BCI after the 1993 investigation.  Ex. 14.]

90. Yezzo served a 10-day suspension and returned to work.

91. A follow-up hearing to determine the extent of disciplinary action was scheduled for May 26, 1994.

92. Prior to this hearing, on May 2, 1994, it was documented that Yezzo was still acting "weird" but that her co-workers were just ignoring her. Ex. 12, p. 17.

93. On May 12, 1994, two weeks prior to that follow-up pre-disciplinary hearing set for May 26, Yezzo provided critical testimony against Keith at his trial.

**F.  Keith was convicted and sentenced to death, and the state actors concealed exculpatory evidence while he exhausted his appeals.**

94. Keith was convicted and sentenced to death in May 1994.

95. Keith timely prosecuted his direct appeal, challenging both his conviction and sentence, and the Ohio Supreme Court affirmed his conviction and sentence on October 1, 1997.

96. Keith timely filed his petition for state post-conviction relief and presented the evidence he had to support his collateral attacks on his conviction and sentence. Keith's state post-conviction litigation concluded when the Ohio Supreme Court declined to accept jurisdiction on December 23, 1998.

97. Keith's first federal habeas petition was filed on September 1, 1999. The federal district court denied it and Keith's motion to alter and amend by October 17, 2001.

98. The United States Court of Appeals for the Sixth Circuit affirmed the district court's denial of habeas relief on July 10, 2006.

99. The Crawford County Prosecutor filed a motion to set Keith's execution date on July 9, 2009.

100. The Ohio Supreme Court scheduled Keith's execution date for September 15, 2010.

**G. Defendants BCI and Crall continued to assert Yezzo's faulty conclusions in their efforts to have Keith executed, despite knowledge of Yezzo's bias and that Yezzo had a history of interpretational and observational errors.**

101. On January 30, 2009, BCI issued Yezzo the last of several documented reprimands before she retired the following month, noting Yezzo's "interpretational and observational errors" and that her "failures could lead to a substantial miscarriage of justice." Ex. 15.

18

102.    In September 2009, without any knowledge of Yezzo's reputation for bias or

of her errors in other cases, Keith retained expert William Bodziak to review

Yezzo's testimony and report regarding the forensic evidence against Keith.

103.    Because Bodziak could not render an opinion without Yezzo's work product,

on October 21, 2009, Keith made a public records request to BCI requesting all

of BCI's public records that pertained to Keith, specifically naming Yezzo as the

forensic analyst who rendered conclusions.

104.    Defendants BCI knew of Yezzo's personnel file, which included the material

exculpatory evidence of Yezzo's history of stretching the truth and mental health

instability, and they knew that BCI's implemented proficiency tests

demonstrated problems with Yezzo's work product.

105.    BCI did not disclose any of the information it knew of Yezzo, and it denied

Keith's public records request on November 9, 2009. Ex. 16.

106.    On May 3, 2010, Keith again submitted a public records request to BCI,

highlighting Keith's innocence of the crime, the seriousness of the case, and the

fact that he was scheduled to be executed in September, and again specifically

referred to Yezzo as the forensic analyst who rendered conclusions. Ex. 17.

107.    BCI did not disclose any of the information it knew of Yezzo, and on May 12,

2010, BCI again denied Keith's request for the documents. Ex. 18.

108.    On May 19, 2010, after a request from the Office of the Governor, Ohio

Attorney General Richard Cordray provided Keith with "all documents received

by the Attorney General's Office relative to your public records request in the Kevin Keith case."

109.    Keith was not provided with Yezzo's personnel file, and BCI continued to suppress that exculpatory information.

110.    On July 7, 2010, Bodziak rendered his conclusions that directly contradicted Yezzo's conclusions and testimony in Keith's case.  Ex. 19.

111.    On July 22, 2010, Keith provided Bodziak's report to an Assistant Crawford County Prosecutor and to an Assistant Attorney General.

112.    In written materials submitted on August 9, 2010 and then in a presentation on August 11, 2010, the Crawford County Prosecutor and the Ohio Attorney General used Yezzo's forensic conclusions in their attempt to convince the parole board to deny clemency to Keith.

113.    On August 19, 2010, the parole board recommended that Keith be denied clemency.

114.    On September 2, 2010—thirteen days before Keith was going to be executed—Governor Strickland commuted Keith's death sentence to life because of the "real and unanswered questions" in the case against him. The Governor referenced the "forensic evidence about which important questions have been raised," and stated "I also find the absence of a full investigation of other credible suspects troubling." Ex. 20.

115.    Keith remained unaware of the exculpatory information concerning Yezzo, because BCI continued to suppress it.

20

116.    By failing to disclose the material information about Yezzo with respect to her scientific testing and opinions, Defendant BCI acted with, at the very least, deliberate indifference to the rights of criminal suspects involved in cases where BCI did forensic testing.

117.    But for Governor Strickland, Keith would have been executed without BCI ever disclosing to him the material, exculpatory information regarding Yezzo.

**H. When Keith discovered the evidence about Yezzo, he brought it to the Crawford County Prosecutor and to the Ohio Attorney General for assistance in fixing the constitutional error caused by the State.**

118.    Keith's counsel brought this information on Yezzo to the attention of the current Crawford County Prosecutor Matthew Crall in an effort to allow the State to correct its egregious mistake in using Yezzo to secure Keith's conviction.

119.    Counsel met with Defendant Crall in April 2016.

120.    Defendant Crall stated that he wanted to look into the information Keith's counsel had given him, and Keith's counsel agreed not to file anything until the State had some time to examine the information on Yezzo.

121.    Additionally, Keith met with former Attorney General Lee Fisher who served in this role during the time Keith was indicted, tried, and convicted.

122.    Fisher was effectively in charge of Yezzo, as BCI operates under the Office of the Attorney General.

123.    Prior to Keith's counsel sharing this information with Fisher, Fisher did not know about this troubling information on Yezzo.

124.  As Attorney General, he relied on the chain of command and those in supervisory positions to handle personnel issues appropriately.

125.  Once given this information, however, Fisher found it to be "very troubling," noting that the analyst's character is important because the analysis is relied upon by juries, lawyers, and the judge.  Ex. 21.

126.  He expressed deep concern that Yezzo's "opinions were very likely wrong," that "the prejudice in [Keith's] case is very significant," and that her "conclusions and testimony led to a miscarriage of justice in []Keith's case." Ex. 21.

127.  Fisher ultimately concluded that had he known this about Yezzo, he would have prevented her from testifying against Keith. Ex. 21.

128.  He also would have ordered another analyst to reexamine the evidence submitted to Yezzo, and stated that defense counsel was entitled to the information in Yezzo's file because it "severely impacts" her credibility." Ex. 21.

129.  Fisher provided his statement as an affidavit. Ex. 21.

130.  Keith's counsel shared this affidavit with Defendant Crall.

131.  Keith's counsel regularly left messages for Crall and sent him emails since that time.

132.  In August 2016, Keith's counsel met with current Attorney General DeWine and several members of his staff to discuss Yezzo's personnel file and its impact on Keith's case.

133. Keith provided Deputy Attorney General for Law Enforcement a copy of his unfiled motion for a new trial based on the newly discovered evidence in Yezzo's file.

134. The Attorney General told Keith's counsel at the meeting that he wished to review the information provided to him, and Keith's counsel agreed not to file his new trial motion until the Attorney General had a chance to look into Yezzo.

135. The day after the meeting, counsel exchanged emails with the Attorney General's office.

136. Since that time, however, counsel has not heard from the Attorney General's office, and emails sent by Keith's counsel remain unanswered.

137. On October 28, 2016, Keith filed his motion for leave to file a motion for a new trial, based on the State's suppression of the information about Yezzo.

138. None of the Defendants dispute that Keith was never provided with Yezzo's personnel file.

139. Defendant Crall and the Crawford County Prosecutor's Office argued that Keith was not constitutionally entitled to it or the information contained within it.

140. Defendants Crall and City of Bucyrus not only failed to correct the constitutional injury caused by the unreliable and erroneous evidence against Keith, but they opposed any attempt to have Keith's *Brady* claim heard on the merits.

23

141.    Defendant Attorney General Mike DeWine told the Columbus Dispatch that
he learned of the information in Yezzo's personnel file and the questions about
her work in 2015.  Ex. 22.

142.    Karen Huey, assistant superintendent of BCI, told the Columbus Dispatch
that BCI could obtain an "outside review" of Yezzo's conclusions but did not
because they did not feel there was a need.  Ex. 22.

143.    Neither the Defendant DeWine nor Defendant BCI has obtained such an
outside review of Yezzo's work in Keith's case.

144.    Defendant BCI currently has Practices for Assuring Quality of Results, but it
has not followed them in Keith's case.

145.    Yezzo's discredited and unreliable conclusions in Keith's case are still being
used by Defendants as proof of Keith's "guilt."

146.    The State via the agents named herein has refused at every step to right this
terrible wrong.

**I.   Defendants Crall and DeWine concealed exculpatory information
from Keith, and he will be unable to have a court consider his claims
on the merits.**

147.    The state court litigation of Keith's 2010 motion for new trial, based on the
State's suppression and destruction of the evidence demonstrating that Foor's
5:00 a.m. call never occurred, ended on April 1, 2013 when the Supreme Court of
the United States denied certiorari.

148.    Based on all previous state litigation, and based on the fact that Defendants
Crall and DeWine previously concealed the evidence of bad faith, Defendants

Crall and DeWine will oppose any attempts to litigate in state court the merits of the *Brady/Youngblood* claims.

149.     On January 13, 2017, the Crawford County Court of Common Pleas denied Keith's Motion for Leave for File Delayed Motion for New Trial Based on Newly Discovered Evidence, without permitting Keith to file his underlying new trial motion on the merits. On June 26, 2017, the Ohio Court of Appeals for the Third District upheld the trial court's denial. The Ohio Supreme Court declined jurisdiction on December 6, 2017, and with that, Keith lost his attempts to have his *Brady* claim based on the Yezzo information heard on the merits in state court.

150.     Based on the Ohio Attorney General's responses to Keith's 2008 and 2013 habeas petitions, Keith anticipates the Ohio Attorney General will oppose any federal litigation and argue that any future habeas petition of Keith's is successive and must meet the requirements in 28 U.S.C. § 2244(b).

151.     Keith filed a federal habeas petition in the federal district court on August 8, 2013, partly based on Bodziak's report denouncing Yezzo's findings.

152.     On August 22, 2013, the Ohio Attorney General responded that because Keith had previously filed a federal habeas petition on September 3, 1999, Keith's petition was successive, should be transferred to the Sixth Circuit, and that he must meet the requirements in 28 U.S.C. § 2244(b) before his claims could be considered on the merits.

25

153. On March 28, 2014, the district court granted the Ohio Attorney General's motion and transferred Keith's case to the Sixth Circuit.

154. The Sixth Circuit denied Keith's motion for authorization to file a second or successive petition and refused to consider Keith's claims on the merits.

**J. Keith was and remains harmed by Defendants' actions and inactions**

155. As a direct and proximate result of the actions of Defendants Yezzo, Cappy, Lenhart, BCI, Bucyrus Police Department, Corwin, Crawford County Prosecutor's Office, and City of Bucyrus, Keith was tried, convicted, and sentenced based on suspect forensic conclusions reached by an analyst whose reputation for untrustworthiness was known and hidden by the Defendants.

156. As a further direct and proximate result of the actions of Defendants Crall and Crawford County Prosecutor's Office, as well as Defendants BCI and DeWine, Keith remains convicted and sentenced to life without parole based on the State's refusal to consider Yezzo's analysis in light of her untrustworthiness and its refusal to reevaluate the evidence Yezzo analyzed.

## FIRST CAUSE OF ACTION – 42 U.S.C. §1983

157. Plaintiff incorporates by reference all preceding and proceeding paragraphs of this Complaint.

158. The Defendants deprived Kevin Keith of his right of access to the courts.

159. At the time of Keith's trial, Defendants BCI, Cappy, and Lenhart had actual knowledge that Yezzo would "stretch the truth to satisfy a department" when evaluating crime scene evidence.  The failure by these state actors to disclose

this to Keith at the time of his trial prejudiced Keith and deprived him of the opportunity for litigating it at the time of his trial.

160.   At all times during which Keith could file a timely appeal and/or collateral attack on his conviction, Defendants BCI, Cappy, and Lenhart suppressed from Keith the information about Yezzo.  Because they failed to disclose this to Keith during this time, Keith was deprived of the opportunity for timely litigating 1) the violation of due process fair trial due to his conviction based on the unreliable opinion rendered by a biased expert; and 2) the State's suppression of information demonstrating the lack of credibility of its expert.

161.   Because Keith obtained the information about Yezzo after the expiration of time to file a timely post-conviction petition or new trial motion, he was required to first obtain leave to file his claims.  He was denied leave to file his claims, and he never was permitted to file his underlying motion on the merits.

162.   At all times during which Keith could file a timely appeal and/or collateral attack on his conviction, Defendants Corwin, Bucyrus Police Department, and City of Bucyrus suppressed from Keith the call logs and call recordings.  Because they failed to disclose this to Keith during his trial, and then destroyed the evidence, Keith was deprived of the opportunity for timely litigating the improper suggestion of the names to Warren.

163.   Because Defendants Corwin, Bucyrus Police Department, and City of Bucyrus suppressed from Keith—during trial and at all times during which Keith could file a timely appeal or collateral attack—the fact that they ignored

the defense subpoena for the call logs and radio logs, Keith was deprived of the opportunity to demonstrate the police acted in bad faith in destroying the call logs and recordings.

164. Keith will be subjected to the higher standard under 28 U.S.C. § 2244(b) when he files again in federal court, and will be required to first obtain authorization to file a successor habeas petition. Because of Defendants' actions, he will again be unable to have his claims heard on the merits in federal court.

165. The actions of Defendants Corwin, Bucyrus Police Department, and City of Bucyrus have deprived Keith of any meaningful opportunity to litigate his claims.

## SECOND CAUSE OF ACTION – 42 U.S.C. §1983

166. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

167. The Defendants BCI, Cappy, Lenhart, Corwin, Bucyrus Police Department, Crall, and DeWine have, under color of state law, deprived Kevin Keith of rights secured by the Fifth and Sixth Amendments to the U.S. Constitution, including but not limited to the rights of due process, fair trial, and confrontation.

168. Defendants BCI, Cappy, and Lenhart failed to adequately supervise, monitor, and address Yezzo's known disqualifying behavior and her reputation for untrustworthiness, and the rules, regulations, customs, policies, and procedures used by BCI to address Yezzo's behavior and reputation were inadequate,

unreasonable, and deliberately indifferent and were the moving force behind the constitutional deprivations Keith suffered.

169.    At the time of the 1993 investigation, Defendant Lenhart failed to insure that Yezzo was, in fact, no longer employed by BCI.  Therefore, she returned to work and was able to provide her testimony against Keith.

170.    BCI's failure to turn over documents concerning Yezzo when she was named specifically in reference to this case further constituted deliberate indifference to Keith's constitutional rights and was a key force behind Keith's continued suffering of constitutional deprivations.

171.    Despite what is known about Yezzo, the evidence analyzed by Yezzo is still treated as and presumed to be inculpatory of Keith. It has not been rejected by Defendant BCI or Defendant DeWine. Until Defendants BCI and DeWine require a quality inquiry and corrective action, providing for an outside review of Yezzo's conclusions in Keith's case, Yezzo's conclusions will continue to be considered evidence against Keith.

172.    The Defendants are leaving in place the conclusion that Davison's car was linked to the scene and to Keith as his getaway car.  Additional, corrective testing could demonstrate that Davison's car had absolutely nothing to do with this case, but the Defendants refuse to do it.

173.    Defendant Retired Chief Michael Corwin engaged in a pattern of constitutionally improper and unsound investigatory practices and procedures in Keith's case. He engaged with Yezzo in a manner designed to elicit from her the

forensic results he wanted. He ignored defense subpoenas so as to deprive the defense of the evidence it sought. His actions constituted deliberate indifference to Keith's constitutional rights and were a key force behind the constitutional deprivations suffered by Keith.

174. Although Defendants Corwin and Bucyrus Police Department knew Yezzo was changing her opinion to fit their theory of this case and although they had the ability to alert the prosecutor and defense and prevent constitutional violations, their failure to act demonstrated deliberate indifference to Keith's constitutional rights, which resulted in constitutional injury to Keith.

175. Although Defendant Attorney General DeWine knew of the pattern of constitutional deprivations Yezzo caused, and although he had the ability to stop such violations by reevaluating evidence she tested in this case, his failure to act demonstrated deliberate indifference to Keith's constitutional rights, which resulted in constitutional injury to Keith.

176. Although Defendant Prosecutor Crall knew of the pattern of constitutional deprivations Yezzo caused, and although he had the ability to stop such violations by reevaluating evidence she tested in this case, his failure to act demonstrated deliberate indifference to Keith's constitutional rights, which resulted in constitutional injury to Keith.

## V.    **JURY DEMAND**

Plaintiff requests a jury trial on all claims triable to a jury.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A. Order that the forensic evidence be reevaluated by a fair and impartial forensic analyst;

B. Order that the Defendants waive all procedural arguments precluding consideration of the claims on the merits.

C. Nominal damages against Defendants.

D. Compensatory damages against Defendants in an amount to be shown at trial;

E. Punitive damages against Defendants in an amount to be shown at trial;

F. Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988; and

G. Such additional relief as the Court deems just and proper.

Respectfully Submitted,

/s/ *James R. Wooley*
James R. Wooley (003850)
Jones Day – Cleveland
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-7345
Jrwooley@JonesDay.com
Trial Attorney for Plaintiff

And

/s/ *Zachary M. Swisher*
Zachary M. Swisher (0076288)
Sybert, Rhoad, Lackey  Swisher, LLC

153 South Liberty Street
Powell, Ohio 43065
Telephone: (614) 785-1811
Zach@law153group.com

And

/s/ *Rachel Troutman*
Rachel Troutman (0076741)
Kathryn K. Polonsky (0096468)
*Office of the Ohio Public Defender*
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215
 (614) 466-5394
Rachel.Troutman@opd.ohio.gov
Kathryn.Polonsky@opd.ohio.gov