# Exhibit A-1

1    Q        And what did you do to participate in the processing

2    of that Oldsmobile?

3    A        I photographed the vehicle as I found it.    I

4    examined the vehicle for pertinent evidence.    I vacuumed the

5    front portion passenger's compartment of the vehicle.    There

6    was various collections made, and then I processed pertinent

7    areas that the Police Department requested for latent

8    prints.

9    Q        And did you analyze the prints yourself?

10   A        No.

11   Q        Did you lift the prints yourself?

12   A        Yes.

13   Q        So looking at Exhibit Number, State's Exhibit

14   Number 137 which you have in front of you there -- you

15   lifted the prints; is that correct?

16   A        Yes.

17   Q        And you took vacuum sweepings from the car?

18   A        That's correct.

19   Q        And you took photographs?

20   A        That's correct.

21   Q        And did you check with anyone at your -- First did

22   you take those to the lab, all those items?

23   A        Yes.

24   Q        And did you check with anyone with regard to those

25   items to find out what the analysis was?

1    A        No.

2    Q        Did you have conversations with Captain Corwin about

3    those items as to the findings?

4    A        Not about these items, no.   I don't remember having

5    a conversation with him.

6    Q        So would you say your job was to kind of go over the

7    car inside and out with a fine tooth comb to see if you can

8    find any carpet fibers that match, any hair samples like

9    from persons for comparison and any glass particles.   What

10   was the purpose of the vacuum sweepings?

11   A        The purpose of the vacuum sweeping is to collect any

12   microscopic or macroscopic evidence that might be -- that I

13   might not be able to see.   And have it analyzed later for

14   determination by the microanalysis section if there is

15   anything there of any value.

16   Q        And in your experiences, tell us is a hair maybe one

17   of the things you couldn't see?

18   A        Could be, yes.

19   Q        And it could be a particle of glass fragment?

20   A        That could be.

21   Q        And it also could be a fiber from a piece of carpet

22   coming off the person's shoe?

23   A        It could be.

24   Q        Now you made a report on March 8, 1994, are you

25   familiar with that?

# Exhibit A-2

IN THE COMMON PLEAS COURT OF CRAWFORD COUNTY, OHIO

STATE OF OHIO,                          :

            Plaintiff               :

       -vs-                             :   CASE NO. 94-CR-042

KEVIN A. KEITH,                         :

            Defendant               :

- - - - - - - - -

     The deposition of G. MICHELE YEZZO, called as a
witness for the State of Ohio in a trial deposition, taken
on May 12, 1994, at the Crawford County Courthouse, 112
E. Mansfield Street, Bucyrus, Ohio 44820, before Diana Wade,
Official Court Reporter and Notary Public, pursuant to
Agreement of counsel.

- - - - - - - - -

APPEARANCES:

        ON BEHALF OF THE PLAINTIFF:

                Russell B. Wiseman
                Prosecuting Attorney
                130 North Walnut Street
                Bucyrus, Ohio   44820

        ON BEHALF OF THE DEFENDANT:

                James H. Banks
                Attorney at Law
                P.O. Box 1950
                Dublin, Ohio   43017

May 12, 1994

### G. MICHELE YEZZO

Called as a witness for the State of Ohio, being first duly sworn in by the Court Reporter according to law, was examined and testified as follows:

### DIRECT-EXAMINATION

BY - MR. WISEMAN:

Q    State your name and occupation for the record.

A    G. Michele Yezzo, Forensic Scientist for the State Attorney General, Bureau of Criminal Identification and Investigation.

Q    And where do you actually do this work?

A    At Headquarters in London, Ohio.

Q    Okay. All right. Would you tell us a little bit about the nature of your work there.

A    Yes, I do the analysis of items of evidence submitted to the laboratory, report the results of the analysis, and testify in Courts throughout the State of Ohio.

Q    How long have you done this kind of work?

A    I have been with the Bureau since 1976, approximately 17 and a half years.

Q    Have you had specialized training to perform this work?

A    Yes, sir, I have.

Q        Would you outline that for us please?

A        I have a Bachelor of Science degree in comprehensive sciences with a concentration in biology and chemistry, with a minor in criminal justice which I received at Youngstown State University in 1976.  I have received specialized training through the F.B.I. and also a number of other symposiums and workshops throughout my career.  These workshops were sponsored by the American Academy of Forensic Science, the Mid-western Association of Forensic Science, and the Mid-Atlantic Association of Forensic Science.

Q        So these are all studies done by you since your employment -- 17 years of employment with BCI & I?

A        Yes, sir.

Q        Have you ever written any articles or taught any courses in your field?

A        I teach periodically for the State of Ohio Peace Officer Training Academy as well as for the Northern California Criminal Justice System; and have taught for the Corning Community College in Corning, New York; as well as doing a number of seminars sponsored by various organizations including the State Health Department and the State Prosecutor's Association, etc.

Q        Okay.  Have you ever testified in court as an expert witness before?

A        Yes, sir, I have.

1    Q        How many times?

2    A        Over 200 times in 49 different counties in Ohio.

3    Q        And have you qualified as an expert in these

4    instances?

5    A        Yes, sir, I have.

6    Q        All right.  Ms. Yezzo, I will hand you what has

7    previously been marked as State's Exhibit 5 for

8    identification.  And I will ask you to take a look at that

9    and tell us if you can identify that?

10   A        Yes, sir, I can.

11   Q        What is it please?

12   A        It's an envelope that contains items submitted to me

13   by mail from the Bucyrus Police Department, submitted as our

14   case number 94-10495G as in George, which contains some

15   papers -- copies of papers in reference to tires.

16   Q        Okay.  I notice it is sealed now.  Do you know how

17   it got that way?

18   A        Yes, sir.  As well as bearing my initials and case

19   number and item numbers, it also bears my initials along the

20   seal.  I was the one that sealed it.

21   Q        When you received that was it sealed?

22   A        Yes, sir, it was.

23   Q        And who broke the seal?

24   A        I did.

25   Q        Would you break the seal now so we can see what is

1    inside?

2    A       Okay.

3    Q       You have opened that envelope; correct?

4    A       Yes, sir, I have.

5    Q       And would you please tell us what is inside it?

6    A       It contains a number of pieces of paper:  G-1 which

7    is a copy of a Firestone Mastercare Car receipt, ticket

8    number 46395532; a copy of a maintenance warranty and

9    service manual, our item number G-2 referring to a vehicle

10   having some TR2000 tires; and thirdly, a copy of  an item as

11   I have marked G-3 of some copies of tire surface

12   impressions.

13   Q       Okay, let's have those marked please.

14                   (State's Exhibits 17, 18, and 19 were marked for

15                   identification.)

16            Now, the items that have been marked 17, 18, and 19,

17   State's Exhibits for identification are the items that were

18   received by you in the envelope marked State's Exhibit 5 for

19   identification?

20   A       That's correct.

21   Q       Okay.  And I am going to hand you another Exhibit

22   marked State's Exhibit 1 for identification which consists

23   of three pages and ask if you can take a look and identify

24   it if you can?

25   A       Yes, sir.

1   Q     Would you please?

2   A     Yes, sir, this is a copy of the report which I

3 issued referring to the BCI Case Number 94-10495 in a number

4 of additional submissions in the case -- submissions from

5 the Bucyrus Police Department either by our agent or the

6 department directly.

7   Q     Okay. I am going to hand you now what has been

8 marked as State's Exhibit 8 for identification and ask if

9 you can identify that?

10   A     Yes, sir, I can.

11   Q     Would you do that for us please?

12   A     This is a photograph of the front portion of the

13 automobile submitted to the laboratory under, again, the

14 same case number 94-10495, this one is dash "E-1."

15   Q     And that was another submission that you used to

16 prepare the report that you just identified?

17   A     That's correct.

18   Q     I am going to hand you more Exhibits. These are

19 kind of bulky. The first one is marked State's Exhibit 3

20 for identification. I will ask you to examine that please

21 and tell us whether or not you can identify it?

22   A     Yes, sir, I can.

23   Q     And what is that please?

24   A     It is a paper bag containing a plaster cast that was

25 submitted to our laboratory under the same case number by

1    one of the field agents.

2    Q        And did you use this in the compilation of the

3    report you previously identified?

4    A        Yes, sir, I did.

5    Q        And now Ms. Yezzo, I will hand you what has been

6    marked as State's Exhibit 4 for identification and ask you

7    to examine that item and tell us if you can identify it?

8    A        Sir, do you want me to open it?

9    Q        Is it sealed?

10   A        It is stapled.

11   Q        Go ahead and open it and look at it.

12   A        Yes, I can.

13   Q        What is it please?

14   A        It is a plaster cast of the partial tire impression

15   submitted to our laboratory by our Agent, Larry Harden.

16   Q        And was this Exhibit that you identified, used by

17   you in the preparation of the report that you previously

18   identified?

19   A        Yes.

20   Q        Were there any other items that you used in the

21   compilation of that report such as photographic evidence?

22   A        Yes, sir, there were a number of photographs gleaned

23   from film that was submitted by again, our agent, Larry

24   Harden.

25                    MR. WISEMAN:  I haven't been showing these

1    to you.

2                    MR. BANKS:  I have seen those.

3                    MR. WISEMAN:  These are the ones she brought

4    with her.

5                    MR. BANKS:  Okay.

6    Q        (Mr. Wiseman) Ms. Yezzo, I am going to hand you a

7    series of exhibits now that have been previously marked--

8    Well, first State's Exhibit 9 for identification, would you

9    tell us if you can identify that?

10   A        Yes, sir, I can.

11   Q        And what is that please?

12   A        It is an enlargement that I made with our copy

13   machine of one of the tires on State's Exhibit, I believe it

14   was--

15   Q        That is right besides you.

16   A        Yes, thank you, number 17.

17   Q        Why did you make that enlargement?

18   A        For purposes of documentation for my file and also

19   for the examination and comparison with the tire impression,

20   the plaster cast we have been discussing and the photographs

21   from the scene.

22   Q        Okay.  I notice that the one item you identified had

23   figures of several tires on it.  Was this particular blowup

24   taken from that?

25   A        Yes, sir.

1    Q    Why did you blow up this particular tire out of all

2    the ones on the page?

3    A    For the purpose of comparison.  It was submitted

4    that that particular tread design tire was what was

5    purported to have been on the vehicle and I was interested

6    in making a comparison to see if it was consistent with that

7    tire tread.

8    Q    I got you, okay.  Okay, I would like you to look at

9    State's Exhibit 10 for identification and I will ask if you

10   can identify that?

11   A    Yes, sir, I can.

12   Q    What is that please?

13   A    It is a photograph made from one of the tires on the

14   vehicle that we have previously mentioned as being item

15   number E-1 of the Bureau submitted on this case.  The

16   vehicle photograph is marked as State's Exhibit Number 8.

17   Q    Okay.  To save time, I am going to hand you State's

18   Exhibits 11, 12, 13, 14, 15, and 16 for identification.

19   They are marked on the back.  I will ask you to look at

20   these one at a time and carefully tell us if you can-- Well

21   identify them and then we can have you tell what they are if

22   you can.

23   A    Yes, I can.

24   Q    You can identify them?

25   A    Yes, sir.

1   Q     Start with the first numbered exhibit and tell us

2   which one that is and tell us what it is.

3   A     The one marked as State's Exhibit 11 is a

4   photographic reversal of a partial license plate impression

5   deposited in snow and it was submitted in the film--  I will

6   rephrase that.  The film for examination was submitted by

7   our agent, Larry Harden as a result of his examination of

8   the crime scene area.

9   Q     And did you use that in drawing a conclusion

10   reflected in the report you previously identified?

11   A     Yes, sir, I did.

12   Q     And the next photo please?

13   A     The second, which is marked as State's Exhibit

14   number 12 would be, again, that same negative.  However,

15   this one is printed as it would appear.  The one marked as

16   State's Exhibit 11 is a photographic reversal where you can

17   read the numbers directly and the one that is State's

18   Exhibit 12 that is as it would appear.  The number would be

19   a photographic mirror image.

20   Q     Okay, let's go to the next one.

21   A     Okay, the one marked State's Exhibit 13 is the

22   overview area, again of the photographic reversal of the

23   noticable impression mentioned as part of State's exhibit 11

24   and 12.  And again, this was created during the course of my

25   examination and/or for court purposes.

1  Q      And you used this in the compilation and findings

2  contained in your report?

3  A      That's correct.

4  Q      Next item please?

5  A      State's Exhibit 14, again that is the same negative

6  as State's Exhibit 13 however State's Exhibit 14 is as it

7  would appear, whereas, State's Exhibit 13 is a photographic

8  reversal to be read directly.

9  Q      Okay, the next one?

10 A      State's Exhibit number 15 is a photographic reversal

11 of the tire impression for the partial tire impression

12 deposited again, in snow, and also taken from the same

13 submitted film by our Agent, Larry Harden.

14 Q      Now what conclusion did you reach based on your

15 examination of Exhibit 4 and 3 and the photographs you have

16 described of the license plate impression?

17 A      I was able to determine as a result of the

18 examination of the plaster cast of the tire impression and

19 also the photograph of the tire impression that again was

20 taken by our Agent, when compared with the tires that were

21 on the vehicle submitted at our item E-1 photograph which is

22 State's Exhibit Number 8 which was the tire in State's

23 Exhibit Number 10--

24 Q      Can we go to the license plate first?

25 A      Okay.

1    Q    Oh, you have two pictures left?

2    A    Yes.

3    Q    I didn't see them. Let's go to those first. Go

4    ahead please.

5    A    State's Exhibit Number 16 is the partial tire

6    impression again from our film, item number 2, this is the

7    same negative as State's Exhibit Number 15 however this was

8    as it appeared where the one in State's Exhibit 15 is a

9    photographic reversal.

10    And we also have-- Well I guess these two Exhibits,

11    State's Exhibits 9 and 10 have been identified, I beg your

12    pardon.

13    Q    Okay, just going on then, did you use all of those

14    to reach or draw the conclusions made in your report?

15    A    Yes, sir, I did.

16    Q    Okay, lets talk first about the license plate

17    impression. I believe you testified that State's Exhibit 3,

18    I will hand you that again, is a plaster cast of some sort

19    of a purported license plate impression; is that right?

20    A    That's right.

21    Q    After examination of State's Exhibit 3 for

22    identification and the photographs you have identified, did

23    you come to any conclusions regarding the impression in the

24    snow by the purported license plate?

25    A    Yes, sir, I did.

1  Q      Okay, and what were those impressions?

2  A      As a result of that examination, I was able to

3  identify the numbers "043" in the region of the, quote,

4  purported license plate area, as well as the overview area

5  which showed it was placed on the vehicle -- similarly

6  placed, I will rephrase.  It was similarly placed on the

7  vehicle as the license plate is placed on the vehicle which

8  was pictured in State's Exhibit Number 8.

9  Q      So the placement of the license plate and the

10  numbers that you were able to identify from the cast and the

11  photograph of it in the snow as submitted to you were

12  consistent with the license plate on the vehicle that was

13  submitted to you for comparison; is that correct?

14  A      The general orientation of the license plate was

15  consistent, yes, sir.

16  Q      Let's talk about the tire now.  Based on your

17  examination of the photograph and you identified State's

18  Exhibit 4 for identification as the plaster cast, and the

19  vehicle that was submitted to you for identification, the

20  vehicle that was depicted in the State's Exhibit photo, did

21  you come to any conclusion regarding this vehicle and those

22  tires and prints?

23  A      Yes, sir, I did.

24  Q      Would you tell us about those please?

25  A      The plaster cast and photograph of the tire

1  impression that I received at the laboratory, were different

2  tread designs from the tires that were on the vehicle again

3  in the photograph marked as State's Exhibit 8 and the tire

4  being in photograph, State's Exhibit number 10, they were

5  different in tread design.

6  Q       In other words, the tires that were on the vehicle

7  submitted to you for examination were inconsistent with the

8  cast and photographs submitted to you as being from the

9  crime scene?

10  A       That's correct.

11  Q       Okay.  What else did you determine about the

12  submissions given to you and these tires?

13  A       Well, I received again, from the"G" submission, some

14  items, I believe those were introduced as State's Exhibit 5.

15  Among them, one which I blew up which is called State's

16  Exhibit Number 9, an enlargement from that on the copy

17  machine, the Triumph 2000 tire, again shown here on my item

18  State's Exhibit 9, I found to be similar in tread design to

19  the plaster cast and also to the photographs of the crime

20  scene area.

21  Q       Were you able to find out anything about the tires

22  that were on the car submitted to you for comparison?

23  A       Yes, sir, I was.

24  Q       And is that contained in your report?

25  A       Yes, sir.

1    MR. WISEMAN:  I think I have no further

2    questions.  Mr. Banks, your witness.

3                   CROSS-EXAMINATION

4    BY - MR. BANKS:

5    Q    Can you say with absolute scientific certainty that

6    the license plate impression from the snow is absolutely the

7    license plate that was on the Oldsmobile that you

8    identified?

9    A    No, sir, I didn't state that.

10   Q    As a matter of fact, you can just say there's a

11   similarity; isn't that correct?

12   A    Well, as I stated, the numbers 043 were present and

13   that the license plate was placed consistently on that

14   vehicle versus the impression in the snow.

15   Q    Would there have been any other types of tests,

16   based on your education and experience, that you could have

17   used to more specifically identify that car, say, for

18   example a paint chip?  Would you be able to run a test on a

19   paint chip?

20   A    Well, sir, I don't understand your question.

21   Q    Let me rephrase it.

22        Let's say you had the Oldsmobile, let's use the

23   State's Exhibit which is--

24   A    Number 8.

25   Q    --State's Exhibit Number 9 (sic).  And let's say you

1   had a piece of the paint that came from State's Exhibit 9 --

2   that Oldsmobile -- would you be able to analyze that at the

3   lab?

4   A    Yes, sir.

5   Q    And tell whether or not that came from that

6   Oldsmobile?

7   A    You would still not prevail in saying it came from

8   that particular vehicle in most circumstances.

9   Q    But my question is, did you have any other type of

10   evidence whatsoever: a chip of paint, fingerprints from

11   anyone coming from around the rim of the tires?  Were there

12   any fingerprints at all?

13   A    I don't do fingerprint work.  I don't know what was

14   submitted for that work.

15   Q    You don't know, if in fact, the tires were changed

16   on that car and if they were by whom?

17   A    No, sir, I do not.  I do know they were manufactured

18   in January of 1994.

19   Q    My question to you is you don't know when or who

20   changed the tires?

21   A    No, sir.

22              MR. BANKS:  I need just a minute.

23              MR. WISEMAN:  Take your time.

24   Q    (Mr. Banks) Ms. Yezzo, were you provided any other

25   type of documentation with regard to the numbers 043 by any

1  police department?

2  A        No, sir, I was not.

3            (Defendant's Exhibit 5 was marked for

4            identification.)

5  Q        Would you take a look at that. Would you agree that

6  is three pages of license numbers from Richland County and

7  Crawford County with cars having license plates ending in

8  the numbers 043?

9  A        That's what it appears to be, sir.

10 Q        And you were never provided that?

11 A        No, sir.

12 Q        So therefore you couldn't really tell us whether or

13 not any of those cars or license plates demonstrated in that

14 list, were in fact the car that made the impression?

15 A        Sir, I don't know that I would be able to do that

16 had I had all the cars in my possession.

17 Q        And you hadn't been able to do that here today with

18 the license plate. All you can tell is that the license

19 plate you saw is similarly placed in height and the number

20 043; is that correct?

21 A        And the orientation towards one side on the front of

22 the vehicle.

23 Q        And in order to compare or make a fair analysis with

24 regards to the other 043 license plates, you would need an

25 impression also; wouldn't you?

A    To do a comparison, yes, sir.

Q    So you can't say and my question is, the license plates you are looking at in Defendant's Exhibit Number 5 could be excluded as being the license plate or car with the license plate that made that impression; could you?

A    I can't make any statement related to those at all, including or excluding them.

Q    Now, you did more than just a tire and license analysis, didn't you, in your report and examination?

A    That's right.

Q    As a matter of fact, you were asked as to your report, C7: received a sealed evidence envelope containing glass samples from storm door window frame.  Is that correct?

A    That's correct.

Q    And what did you find from the examination of that evidence?

A    That was submitted as standards for comparison for any glass that might be found on certain other items.

Q    Did you find any of that glass in the car with the license number 043 that you have identified in the Exhibit for the State?

A    No, sir, I did not.

Q    Then you were also asked as to number C8:  sealed evidence bag containing carpet sample.  Can you tell us what

1    you did with that?

2    A       Again, that was submitted as a standard for

3    comparison.

4    Q       And where did it come from do you know?

5    A       I can't tell you off hand other than it was

6    submitted as a standard from I believe the residence.

7    Q       What did you compare it to or analyze it for?

8    A       I used it as a standard for comparison with any

9    samples from sweepings to see if, in fact, any fibers would

10   coincide with the samples in that standard.

11   Q       What was your understanding as to where the

12   sweepings came from?

13   A       They were submitted as having been taken from the

14   vehicle that we had as submission E1.

15   Q       Okay, and what vehicle was that?

16   A       The vehicle that is in the photograph, State's

17   Exhibit Number 8.

18   Q       Number 8?  The Oldsmobile we have been talking

19   about?

20   A       That's correct.

21   Q       With regards to the carpet sample, did you find any

22   carpet samples in that car that would match?

23   A       I found no fibers that were consistent with it, no,

24   sir.

25   Q       With regard to C11, you analyzed sealed evidence bag

1    containing clothes and shoes removed from the residence of

2    Kevin Keith; is that correct?

3    A      That's is correct.

4    Q      What type of tests did you perform on that?

5    A      I performed an analysis to determine if there was

6    any blood present on those items.

7    Q      Did you check for carpet fibers also?

8    A      Yes, sir.

9    Q      Did you check for glass samples?

10   A      Yes, sir.

11   Q      And what did you find?

12   A      I found neither.

13   Q      No glass samples or carpet fibers and no blood

14   samples?

15   A      That's correct.

16   Q      Then C12 on your report you have: One sealed bag

17   containing clothes and shoes of Kevin Keith at the time of

18   arrest.  Was it your understanding in C11, the articles of

19   clothing and shoes came from his residence as reported?

20   A      I believe that was stated on the submission, yes,

21   sir.

22   Q      And C12, these items came from off of his body at

23   the time of his arrest.  Is that your understanding?

24   A      Again, as I understand it.

25   Q      What type of tests did you perform with regard to

1   C12?

2   A       I examined the debris as well as analyzing them for

3   any potential blood stains.

4   Q       And did you find anything that connected Kevin Keith

5   to those fibers or other things you were looking for like

6   blood stains, carpet fibers, from the broken glass from the

7   window frames?

8   A       I found no glass or fibers that were consistent with

9   the carpet standards submitted and I found no blood stains

10  on the items.

11  Q       You were submitted as a matter of fact, by Captain

12  Blankenship, what is referred to as D2, a bag containing

13  shoes and socks of Quanita Reeves.  Did you find anything

14  through your analysis with regard to those articles that

15  would be associated or implicate any contact with Kevin

16  Keith?

17  A       Sir, I don't believe any analysis was done of those

18  items.

19  Q       You didn't do an analysis on those items?

20  A       That's correct.

21  Q       Could you explain for me on your last page under

22  Item 2 of your report the second paragraph:  "Further

23  examination of these tires revealed, DOT..."  What does that

24  stand for?

25  A       Department of Transportation.

Q      And there is a number sign and some letters and 034?

A      That's correct.

Q      Do you know what the 034 stands for?

A      That refers to the manufacture and it refers to the fact it was manufactured in the third week of 1994.

Q      Okay, now with regard to your tire impressions, regarding the Triumph 2000, that is the brochure that was in the car that you identified--

A      No, sir.

Q      --the new tires?

A      No, the brochure was submitted to me directly via the Bucyrus Police Department.

Q      What does TR2000 mean to you?

A      It had 2000 S-A-T-R-A for the Triumph 2000; which is a brand and style of tire made by Bridgestone, Firestone.

Q      And you referred to that in number G1 and G2; is that correct?

A      Yes, sir.

Q      And were those the items in the booklet that you documented or that was found in the car or that you associated with being purchased by those documents?

A      Those are the items that were submitted to the laboratory which I have opened here, that were in State's Exhibit Number 5.  They are copies of brochures received directly from the Bucyrus Police Department.  As to whether

1  or not they came from the vehicle, I have no knowledge of
2  that, sir.
3  Q     And with regard to Exhibit Number 5 and that
4  documentation, you are saying the tire impression is similar
5  in tread and design; is that correct?
6  A     That's correct.
7  Q     Now, I am not trying to challenge you at all.  I am
8  trying to learn about the difference between similarly and
9  absolutely.  Is there any test that you can do where you
10  could say that you were absolutely sure that is the tire?
11  A     Sir, what you have is a partial tread design
12  deposited in the snow, and as a result of that, the portions
13  that are sufficiently registered to examine are the same as
14  the tire that I have.  However, not all of the tire is
15  registered and within our agency the results are what we
16  call similar.
17  Q     So based on the amount of information available to
18  you, that is the only result that you could come up with?
19  A     Based on the material that was available that is the
20  conclusion that I can draw, yes, sir.
21  Q     Now, if you would have had a complete tire
22  impression or maybe the tire itself, you could compare it to
23  the picture and probably give a more complete--
24  A     Well, again, the first thing we are talking about is
25  a partial design and you would need a complete design.

Q        But my question is, if you had a complete design,
would you be able to give a complete answer?

A        It depends on if there were individual markings
sufficiently registered for identification.

Q        So you're really not sure completely about that tire
at all but are merely giving an impression based on what you
were provided with and to the extent to say there are some
similar traits with the partial cast which you compared to
the literature and brochure you were provided by the police
department; is that correct?

A        No, sir.

Q        Okay, tell us what you are saying?

A        What I am saying is basically as stated in the
report and that is that the partial design that was present
in the snow bank and also on the plaster cast is similar in
design to the Triumph 2000, and incidentally, different than
the tires that were present on the vehicle that was
submitted as our number E1 in State's Exhibit 8, depicting
that vehicle.  So it can be limited having been different
than the tires that were present on the vehicle which I
received and that they were -- the portion of the tread
design present and sufficiently registered for the
examination is the same as the tire, Triumph 2000.  The
reason it is stated as being similar and as I stated
previously is that when one has not an entire design, one

1    can only speak of what is present and what was deposited in

2    the snow that I have are the same, however for the sake of,

3    again, conservatism, I will state are similar with the tread

4    design because it is not completely registered.

5    Q      So what you are really saying after all that is that

6    it is not conclusive?

7    A      No, sir, it conclusively eliminates the tires that

8    were on the vehicle and it's similarity is it would have

9    originated from the Triumph 2000.

10   Q      But did not conclusively originate from the Triumph

11   2000, just similarly not conclusively?

12   A      Conclusive in what respect, sir?

13   Q      Conclusively, that you absolutely know that the

14   tires that were on that car, I guess you could say, were

15   there at that time?  You can't say that?

16   A      I can absolutely say that it is not the tire that

17   was on the vehicle as I received it.

18   Q      Well, that is absolute.  But you can't say the tires

19   that are in the pictures you identified were, in fact, the

20   tires that were purchased can you?

21   A      The tires that were purchased?  I don't know

22   anything about the tires that were purchased.

23   Q      They didn't inform you to make an analysis or

24   comparison on the tires from the pictures and the tires in

25   the impressions to see if they were different?

1    A        I used what was submitted.

2    Q        Okay.  You also did a sample analysis on a foot

3    print?

4    A        Yes, sir, I did.

5    Q        Okay, what type of foot print did you analyze?

6    A        Again there was a partial tread design foot print in

7    the snow depicted in the photographs submitted by our agent,

8    Larry Harden.

9    Q        And did you have a plaster cast?

10   A        No, sir.

11   Q        Were you given any plaster cast as you were given

12   these?

13   A        No, sir.

14   Q        Okay.  Did you make a determination with regard to

15   the foot prints that were provided?

16   A        Yes, sir, I did.

17   Q        And what was that final analysis?

18   A        As a result of the examination of the footwear

19   impression depicted in the photograph, they were different

20   in tread design from the shoes that were submitted within

21   our item, I believe C11 and C12.

22   Q        Do you have anywhere in your report where you talk

23   about having different findings of foot impressions; or did

24   you not record that?

25   A        If I might refer to the report?

1  Q       Would you please.  If you look at page three of your
2  report under number 4.  Would that be your response to that?
3  A       Yes, the footwear impression is different in tread
4  design from the footwear items submitted in items 11 and --
5  I beg your pardon, C11 and C12.
6  Q       Go now to page two of your report, F3 you talk about
7  sweeper filter and vacuum sweepings from the gray 1982
8  Oldsmobile and we already established that you weren't able
9  to find anything?
10 A       That's correct.
11 Q       And F4, again vacuum sweepings from the same car,
12 you found nothing?
13 A       That's right.
14 Q       Okay, F5, the sweeper filter, you found nothing,
15 same car?
16 A       Yes, sir.
17 Q       Also all of these F3, 4, 5, and 6 all came from the
18 Oldsmobile you identified in the Exhibit.  And again as you
19 read on, the submission portion of the report on page two,
20 they were all submitted as originating from that vehicle?
21 A       That's what it means to me.
22 Q       Well, you don't have any reason to doubt they were?
23 A       No, sir, but for the purposes of identification, I
24 can't state that either.
25 Q       I understand that.

1    Now, with regard to page one, number A4, A7, A13,

2    samples of blood collected from three of the victims.  Were

3    you able to find any types of blood samples in your

4    analysis, categorized as Type A human blood on any of the

5    items that were provided to you with the identity of Kevin

6    Keith?

7    A    I believe I have answered that question previously,

8    sir.

9    Q    Would you answer it again for me?

10   A    Certainly.  I did not find any blood stains on the

11   clothing articles submitted to the laboratory.

12   Q    Now, on your last page there from F6, you did make

13   an analysis with regard to Negroid and/or Caucasian hair

14   samples; is that correct?

15   A    That's correct.

16   Q    And where did that come from?

17   A    F3, 4, 5, and 6.

18   Q    And you reached a conclusion that there was Negroid

19   and/or Caucasian hair samples found?

20   A    Yes.

21   Q    Were you further given any type of head hair samples

22   from Kevin Keith for comparison with these particular

23   samples?

24   A    No, sir, no further analysis was done on them.

25             MR. BANKS:  Okay, nothing further.

1    MR. WISEMAN:  A couple questions in line of
2  redirect that counsel asked you.

3                    REDIRECT-EXAMINATION

4  BY - MR. WISEMAN:

5  Q       You were asked some additional questions regarding
6  your observations of the tires that were present on the
7  vehicle submitted to you for comparison and depicted in the
8  photograph of the car.

9  A       State's Exhibit 8.

10 Q       Thank you.  Were you able to observe anything about
11 that; the physical nature of those tires as to the wear of
12 them or anything that gave you any clues to--  I know you
13 testified previously that in your opinion they were
14 manufactured the third month of 1994, was there anything
15 else like how they were mounted on the car?

16 A       They were manufactured in the third week of 1994 and
17 there were visible -- you could still see the small beads on
18 the surface of the tread design which would indicate there
19 was very minimal amount of wear on them.  I couldn't state a
20 specific amount of miles but there was a very minimal amount
21 of usage.

22 Q       Was there anything unique about the way they were
23 mounted on the rim or on the car?

24 A       Not that I recall at this time.

25 Q       Were they balanced?

A     I did not see any weights that were on them at that point, no, sir.

MR. WISEMAN:  Thank you, I have no further questions.

Any further questions?

MR. BANKS:  I have just one in reference to that.

### RECROSS-EXAMINATION

BY - MR. BANKS:

Q     So you are saying -- we are talking about the tires as they were on the car that you examined?

A     That's correct.

Q     And your opinion was there was minimal wear on the tires?

A     Yes, the beads that were on the tread surface itself were still very much present.

Q     Okay, and when you say minimal amount, do you have any idea how many miles?

A     As I stated, I wouldn't make a determination on that.  I won't draw any conclusions.  That would be rather speculative.  There are many ways to account for the wear of tires.

MR. BANKS:  Thank you.

MR. WISEMAN:  I would move for the introduction of all those exhibits.  Do you have any

1  objection?

2               MR. BANKS:  No, I have no objections.

3           (The witness waived signature.)

4

5

6

7  STATE OF OHIO       )
                         )ss:

8  COUNTY OF CRAWFORD   )

9        I, Diana Wade, Official Court Reporter and Notary

10  Public within and for the State of Ohio, duly commissioned

11  and qualified, do hereby certify that the above named,

12  G. MICHELE YEZZO, was by me, before the giving of her

13  deposition, first duly sworn to testify to the truth, the

14  whole truth, and nothing but the truth; that the deposition

15  as above set forth was reduced to writing by me by means of

16  stenotype and was later transcribed into typewriting by me;

17  that the signing of the deposition by the witness was waived

18  by counsel; that the reading and signing of the deposition

19  was specifically waived by the witness; that the said

20  deposition was taken pursuant to agreement of counsel, and

21  was completed without adjournment; that I am not a relative

22  or attorney of either party or otherwise interested in the

23  event of this action.

24        IN WITNESS WHEREOF, I have hereunto set my hand and

25  seal of office, at Bucyrus, Ohio, this 13th day of May,

     1994.

                     _Diana Wade_
                   Diana Wade, Notary Public
                   For the State of Ohio

# Exhibit A-3



**Attorney General**
**Lee Fisher**



STATE'S
EXHIBIT

# / 3 pages

BCI-30 (Rev. 3-91)

**Bureau of Criminal Identification and Investigation**                    **Laboratory Report**

To: Bucyrus Police Department
Captain Corwin
500 S. Sandusky Avenue
Bucyrus, Ohio  44820

BCI Lab Number:  94-10495, 94-10495-A
94-10495-C, 94-10495-D
94-10495-E, 94-10495-F
94-10495-G,

Analysis Date:  031694

Re: HOMICIDE AND SHOOTING/
KEVIN A. KEITH
VICTIM:  RICHARD A. WARREN,
LINDA CHATMAN, MARICHELL D. CHATMAN,
MARCAE CHATMAN, QUANITA REEVES AND
QUINTON REEVES

Agency No:  94000315

Submitted on 021494 by Larry D. Harden, BCI Agent (94-10495)

#2.      Four (4) rolls of 34mm color film.
#42.     One (1) brown paper bag containing one (1) plaster cast
of a license plate.
#43.     One (1) brown paper bag containing one (1) plaster cast
of tire impression.

Submitted on 021694 by Robert D. Setzer, BCI Agent (94-10495-A)

#A4.     One (1) tube of blood collected from Marshay Chatman.
#A7.     One (1) tube of blood collected from Marscella Chatman.
#A13.    One (1) tube of blood collected from Linda Chatman.

Submitted on 021694 by Larry D. Harden, BCI Agent (94-10495-C)

#C7.     Sealed evidence envelope containing glass samples from
storm door window frame.
#C8.     Sealed evidence bag containing carpet sample.
#C11.    Sealed evidence bags containing clothes and shoes
removed from residence of Kevin Keith.
#C12.    One (1) sealed bag containing clothes and shoes of
Kevin Keith at time of arrest.

Submitted on 022494 by Captain R.L. Blankenship (94-10495-D)

#D2.     Sealed bag containing shoes and socks of Quanita
Reeves.

Please address inquiries to the office indicated, using the BCI lab number.

[] BCI & I - Fremont Office
405 Pine Street
Fremont, Ohio 43420
Phone: (419) 334-3851

[✓] BCI & I - London Office
P.O. Box 365
London, Ohio 43140
Phone: (614) 466-8204

[] BCI & I - Richfield Office
P.O. Box 336
3333 Brecksville Road
Richfield, Ohio 44286
Phone: (216) 659-4600

[] BCI & I - Cambridge Office
60788 Southgate Road
Byesville, Ohio 43723
Phone: (614) 439-3655

```
                              94-10495, 94-10495-A
                              94-10495-C, 94-10495-D
                              94-10495-E, 94-10495-F
                              94-10495-G
                              - page 2 -
```

CONTINUED:

Submitted on 030794 by Captain R.L. Blankenship (94-10495-E)

#E1.    1982 Oldsmobile Omega, 4S, Ohio Registration MVR043,
        VIN#1G3AB69R3CW331319.


Submitted on 030894 by Larry D. Harden, BCI Agent (94-10495-F)

#F3.    One (1) sealed evidence envelope containing paper,
        sweeper filter, and vacuum sweepings from grey 1982
        Oldsmobile, Ohio Registration MVR043.
#F4.    One (1) sealed evidence envelope containing paper,
        sweeper filter, and vacuum sweepings from grey 1982
        Oldsmobile, Ohio Registration MVR043.
#F5.    One (1) sealed evidence envelope containing paper,
        sweeper filter and vacuum sweepings from grey 1982
        Oldsmobile, Ohio Registration MVR043.
#F6.    One (1) sealed evidence envelope containing paper,
        sweeper filter, and vacuum sweepings from grey 1982
        Oldsmobile, Ohio Registration MVR043.

Submitted on 031494 by Captain M.L. Corwin via mail (94-10495-G)

#G1.    Copy of store sales receipt for tires sold and placed
        on item #E1 on 08/12/93 by owner.
#G2.    Copy of maintenance and warranty manual for same tires.
#G3.    Company photo of triumph 2000 tire put on car as
        mentioned above and believed to have been on vehicle at
        time of crime.

FINDINGS:

Examination of photographs from the film submitted as item #2,
revealed the presence of a partial license plate impression
(plaster cast submitted as item #42), a tire impression (plaster
cast submitted as item #43) and a footwear impression registered
in snow, comparison of these impressions with submitted standards
revealed that:

    1).  The license plate region on item #2 bears the numbers
         "043" and is set toward the driver's side of the car
         with spacing and orientation similar to the license
         plate "MVR043" on the vehicle submitted as item #E1.

94-10495, 94-10495-A
94-10495-C, 94-10495-D
94-10495-E, 94-10495-F
94-10495-G
- page 3 -

FINDINGS (cont.):

2). The tire impression is different in tread design from the tires on item #E1.

Further examination of these tires revealed DOT#HYJKRCT 034". Reference indicates that these tires were manufactured by the Bridgestone-Firestone, Inc. plant in Oklahoma City, Oklahoma, in the third week of 1994.

#3). The tire impression is similar in tread design to the copied pattern marked as "Triumph 2000" on item #G3. (This is documented as "TR2000" on the receipts marked items #G1 and #G2).

#4). The footwear impression is different in tread design from the footwear items submitted in items #C11 and #C12.

Analysis of the blood standards in items #A4, #A7 and #A13 revealed the presence of type "A" human blood.

Analysis of the clothing article in items #C11 and #C12 failed to indicate the presence of blood.

Comparison of the debris from items #C11 and #C12 and the contents of items #F3, #F4, #F5 and #F6 failed to reveal the presence of fiber samples which were consistent with the carpet in item #C8 or glass samples for comparison with item #C7.

Further examination of the contents of items #F3, #F4, #F5 and #F6 revealed the presence of Negroid and/or Caucasian head hair samples which are suitable for comparison.

No analysis was performed on items #C11D (sweeper bag) or #D2.

G. Michele Yezzo
Forensic Scientist

GMY/rkm
T - 031794

CC: Larry Harden, BCI Agent
Robert D. Setzer, BCI Agent