# EXHIBIT A

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0192p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT
———————————

DERRICK BUNKLEY,

      *Plaintiff-Appellee,*

 *v.*

CITY OF DETROIT, MICHIGAN, et al.,

      *Defendants,*

LATONYA MOSES; JADE TANGUAY; SERGEANT LUCAS;
MARSHALL DENNIS; CALVIN WASHINGTON,

     *Defendants-Appellants.*

> No. 17-2223

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-11593—Bernard A. Friedman, District Judge.

Argued:  July 26, 2018

Decided and Filed:  August 29, 2018

Before:  GUY, BATCHELDER, and BUSH, Circuit Judges.
———————————

**COUNSEL**

**ARGUED:**  Sheri L. Whyte, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan,
for Appellants.  Heather Lewis Donnell, LOEVY & LOEVY, Chicago, Illinois, for Appellee.
**ON BRIEF:**  Sheri L. Whyte, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan,
for Appellants.  Heather Lewis Donnell, LOEVY & LOEVY, Chicago, Illinois, for Appellee.

————————————

## OPINION

————————————

ALICE M. BATCHELDER, Circuit Judge.  In this interlocutory appeal from the denial of the defendants' motion for summary judgment, the defendants appeal several rulings, one of which concerns qualified immunity.  We AFFIRM in part and DISMISS in part.

## I.

Detroit Police arrested Derrick Bunkley on a charge of attempted murder, the State of Michigan prosecuted him, and a jury convicted him.  But Bunkley was innocent.  When the conviction was eventually overturned, Bunkley sued the City of Detroit on a *Monell* claim, Police Investigator Latonya Moses on a claim of malicious prosecution, and Police Officers Jade Tanguay, Richard Lucas, Marshall Dennis, and Calvin Washington on claims of false arrest and failure to intervene to stop the wrongful arrest.  The district court granted summary judgment to the City.  But the court denied the individuals' motions, finding material questions of fact as to probable cause for the arrest or prosecution, Moses's influence on the decision to prosecute, and the officers' responsibility to intervene.  The court also denied summary judgment on grounds of qualified immunity.  *See Bunkley v. City of Detroit*, No. 16-cv-11593, 2017 WL 4005919 (E.D. Mich. Sept. 12, 2017).  The claims remaining for trial allege false arrest and failure to intervene against Tanguay, Lucas, Dennis, and Washington, and malicious prosecution against Moses.

### A.

At about 11:30 p.m. on May 3, 2014, a woman named Paris Ainsworth parked her car on the street near her Detroit home.  Two men approached her, brandishing guns.  She drew her own gun and they shot at her, hitting her twice.  But when she shot back, they fled.  She called 911 from a neighbor's house and an ambulance took her to Sinai Grace Hospital.  She described the assailants to the responding police officers as "two black males wearing all black."

At that same time, Derrick Bunkley, a 22-year-old black man, was at his mother's house four miles away playing video games with his younger brothers and posting to Facebook pictures

of them doing so.  At about 1:30 a.m., Bunkley received a call on his cell phone telling him that his father, Charles Knox, had been shot, so he ran to nearby Sinai Grace Hospital to try to see him.[1]  Bunkley sat in the hospital waiting area.  He was wearing all black clothing.

Because the Detroit Police Department classified both incidents as "non-fatal shootings," a supervisor, Sergeant Lucas, assigned Officers Washington, Tanguay, and Dennis to investigate both.  These officers went first to the Ainsworth crime scene and then to the hospital to talk with her.  Ainsworth described her attackers as two black males in their 20s, wearing dark clothing: one dark-skinned, 5'7", and 200 lbs, and the other light-skinned, 5'4", and medium build.[2]  Ainsworth thought she might have hit the "thicker," "bigger" man with a gunshot.

With regard to the Knox shooting, these officers did not inspect the crime scene, did not take a statement from Knox at the hospital that night, and did not talk to any doctor about his wounds (Knox had been shot once through each leg, leaving no bullets or fragments).  Instead, they assumed that Knox and Bunkley were Ainsworth's assailants and that Knox, despite his age (47 years old) and light skin, was the man Ainsworth thought she might have shot.

So the detectives went to see Bunkley in the waiting room.  Bunkley is a young black man and was wearing black clothing.  The officers asked Bunkley for identification, which he provided, though he did not know why they had asked and they did not tell him.  The officers left the waiting room, called Sergeant Lucas for permission to arrest Bunkley, and returned a few minutes later.  They arrested Bunkley and told him the reason for the arrest was a probation violation.  That was untrue and fabricated, as they later admitted.  Despite Bunkley's protests that he had no probation violation, they took him to the Detroit Detention Center where he was incarcerated by 3:00 a.m.  A corrections officer later revealed to him that he had been arrested because the police suspected that he and his father had committed the Ainsworth shooting.

The next morning, Officer Latonya Moses was assigned as the Lead Investigator of the Ainsworth shooting.  That afternoon, she and Investigator Glenda Fisher showed Ainsworth two

---

[1]Knox initially told police that he was shot by three armed men near his home but later attested that he was actually shot while selling drugs at a different house.  Both houses are about seven miles from Ainsworth's home.

[2]In their briefs, the defendants recite Ainsworth's description of the attackers as one younger and one older, but that testimony is from her deposition in this case, years later.  That is not how she described them then.

photo arrays—one with Knox and another with Bunkley.  A defense attorney attended the photo-array lineups and found nothing suggestive.  On the first array, targeting Knox, Ainsworth said, "[N]o, he was younger."  Moses then showed her the second array and Ainsworth chose Bunkley.  At the time of this identification, however, Bunkley had already been arrested.

Later, Moses met with Bunkley at the Detention Center to take a statement.  Bunkley denied any involvement in or knowledge of the Ainsworth shooting, told Moses that he was at his mother's house at the time in question (i.e., during the Ainsworth shooting), and insisted that he could prove his alibi with his posted, time-stamped Facebook pictures.  He even gave Moses his login information so she could corroborate this alibi.  Moses looked at the Facebook page and obtained warrants for Bunkley's phone records and Facebook page, but claimed not to have seen the photos until the first day of trial.  There is no dispute that Bunkley had posted photos of himself at his mother's home during the time of the Ainsworth shooting, just as he had claimed, which was strong evidence of his alibi.

The next day, Moses met with prosecutor Matthew Penney and recommended that they prosecute Bunkley for attempted murder.  During that meeting, Moses falsely asserted that: (1) Bunkley and Knox arrived at the hospital together; (2) Knox refused to turn over the bullets that wounded him; and (3) hospital security had detained Bunkley, implying that he would have fled.  Moses knew that these assertions were untrue.  Moses also omitted the fact that an ambulance had picked up Knox alone, seven miles from Ainsworth's house; that Ainsworth had rejected the Knox photo array because the men depicted were too old; and Bunkley's Facebook-post alibi.  Penney testified that he relied on Moses's information in deciding to prosecute Bunkley.

At trial, Moses sat at counsel table and assisted Penney.  Moses also testified and, during that testimony, suggested that Bunkley's mother had changed the time stamp on the Facebook photos and said that there "was no phone activity whatsoever" on Bunkley's phone at the time of the Ainsworth shooting.  Both of these were untrue.  The jury convicted Bunkley of assault with intent to commit murder and the court sentenced him to 15 to 30 years in prison.  Bunkley's petition for post-conviction relief included forensic testing that verified that the Facebook photos of him at his mother's house were taken by his phone between 11:40 and 11:44 p.m. and

legitimately posted to Facebook.  The court granted the petition and the prosecutor dismissed all charges.  By then, Bunkley was 24 years old and had spent nearly two years in prison.

**B.**

Bunkley sued and the defendants moved for summary judgment.  The officers challenged the false-arrest claim by arguing that they had probable cause to arrest Bunkley, but the district court found genuine disputes of material fact that prevented summary judgment on this issue:

> [V]iewing the facts in the light most favorable to [Bunkley], . . . there is a genuine issue of material fact as to probable cause.  A reasonable jury could find that the arresting officers lacked probable cause to arrest [Bunkley].  The [c]ourt considers the facts known to the arresting officers at the moment of arrest.  Notably, [Bunkley] was arrested between 2:00 a.m. and 3:00 a.m.—i.e., before Moses conducted the photo lineup and learned of [Bunkley]'s Facebook alibi.

> What facts did the officers know at the moment of arrest?  On the one hand, Ainsworth told the officers that she may have shot one of her assailants, and [they knew] Knox had been shot.  Also, both Knox and [Bunkley] were black males wearing dark clothing.  On the other hand, Knox was much older and had a lighter complexion than Ainsworth's second assailant.  Knox was shot several miles away from Ainsworth's house.  [Bunkley] and Knox did not enter the hospital together.  And the description 'black males in twenties in dark clothing' is vague.  How many thousands of black men in their twenties live in and around Detroit?  And how many of those wear dark clothes?  Too many for summary judgment.  There is a genuine issue of material fact as to probable cause.

*Bunkley*, 2017 WL 4005919, at *3 (citation omitted).

On the malicious-prosecution claim, Moses argued that she did not influence the decision to prosecute Bunkley and, even if she had, there was probable cause to prosecute.  Again, the district court found that genuine disputes of material fact prevented summary judgment:

> A reasonable jury could find that Moses participated in or influenced the decision to prosecute.  Moses was the lead investigator.  She sent a warrant packet to the prosecutor.  She took the stand.  She personally assisted the prosecutor during trial.  Perhaps Moses did not make the ultimate decision to prosecute, but a reasonable jury could find that she influenced it.

*Id.* at *4.  Regarding probable cause to prosecute, the court explained:

> There were several conflicting pieces of information Moses discovered post-arrest.  For example, the morning after the shooting[,] Ainsworth gave a strong,

positive identification of [Bunkley].  But she also concurrently gave a strong, negative identification of Knox—the arresting officers' only link from Ainsworth to [Bunkley].  Moses also discovered the exculpatory Facebook evidence.  Viewing this evidence in a light most favorable to [Bunkley], a reasonable jury could find that the prosecution lacked probable cause.  Consequently, this claim survives summary judgment.

*Id.*  The officers also challenged the failure-to-intervene claim, but the district court rejected that challenge as well, appearing again to rely on disputes of material fact:

[A]ll four of the allegedly offending officers were present for or explicitly assented to [Bunkley]'s arrest.  If the arrest was unlawful, they observed it and/or had an opportunity to prevent it.  Further, the constitutional harm element—i.e., false arrest—is already going to the jury.  Therefore, this claim survives summary judgment.

*Id.* at *5.  Finally, the court addressed qualified immunity (directed at both the federal and state law claims) and denied it based again on its findings of genuine disputes of material fact:

[The] defendants admit [that] an individual's right to be arrested only when probable cause exists is clearly established.  Thus, the question is whether, viewing the facts in the light most favorable to [Bunkley], the arresting officers and Sergeant Lucas violated [Bunkley]'s clearly-constitutional rights.

Here, . . . the question of qualified immunity turns upon which version of the facts one accepts.  As noted above, there are disputed issues of material fact, specifically whether there was probable cause to arrest and prosecute [Bunkley].  Arguments can be made on both sides.  For example, the jury could find that the officers were justified in their arrest of [Bunkley] because he and Knox matched Ainsworth's description.  Or, it could find that the description was too general and insufficient to support probable cause.  Because the reasonableness of the officers' conduct is going to the jury, granting defendants' motion for qualified immunity is not appropriate.

*Id.* at *6-7 (quotation marks and citations omitted).  The court also rejected the legal argument that the right underlying the failure-to-intervene claim was not clearly established.  *Id.* at *7-9.  This appeal followed.

## II.

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Id.* at 680. In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact"; that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If the district court finds that the plaintiff's evidence could support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). As the denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, it is generally not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Thus, on an interlocutory appeal from the denial of qualified immunity, we may decide a challenge to the district court's legal determination that the defendant's actions violated a constitutional right or that the right was clearly established. *Id.* We may also decide a challenge to a legal aspect of the court's factual determinations, such as whether the court properly assessed the incontrovertible record evidence. *Plumhoff v. Rickard*, 572 U.S. --, 134 S. Ct. 2012, 2018 (2014); *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014). And we may decide, as a legal question, a challenge to the court's factual determination insofar as the challenge contests that determination as "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

We may not, however, decide a challenge to the district court's determination of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Because such a challenge is purely fact-based, lacking any issue of law, it "does not present a legal question in the sense in which the term was used in *Mitchell*," *Plumhoff*, 134 S. Ct. at 2019, and is not an appealable "final decision" within the meaning of § 1291. The Supreme Court has found these types of prohibited fact-based

("evidence sufficiency") appeals in challenges to the plaintiff's allegations of "what [actually] occurred[] or why an action was taken or omitted," *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011), who did it, *Johnson*, 515 U.S. at 307, or "nothing more than whether the evidence could support a [jury's] finding that particular conduct occurred," *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). That is, "*Johnson* applies to interlocutory appeals that solely contest the plaintiff's account of the facts." *Family Serv. Ass'n v. Wells Twp.*, 783 F.3d 600, 607 (6th Cir. 2015).

Therefore, putting these "mays" and "may nots" together into a single jurisdictional rule: we may not decide a challenge aimed solely at the district court's determination of the record-supported evidence, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations. *See, e.g.*, *Behrens*, 516 U.S. at 312-13 ("Denial of summary judgment often includes a determination that there are controverted issues of material fact and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable." (internal citation omitted)); *DiLuzio*, 796 F.3d at 610.

It is true that, following *Johnson*, we readily cited the district court's finding of contested facts to dismiss such interlocutory appeals for lack of jurisdiction. But after *Plumhoff*, we adopted a different approach in which we instead excise the prohibited fact-based challenge so as to establish jurisdiction. *See DiLuzio*, 796 F.3d at 610 (relying on *Roberson*, 770 F.3d at 403 ("*Plumhoff* appears to cabin the reach of *Johnson* to purely factual issues that the trial court might confront if the case were tried." (quotation marks and citation omitted))).

Under this approach, when legal and factual challenges are confused or entwined, "we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Roberson*, 770 F.3d at 402 (citing *Johnson*, 515 U.S. at 319) (quotation marks omitted). We likewise separate an appellant's reviewable challenges from its unreviewable. *DiLuzio*, 796 F.3d at 610; *see also Romo v. Largen*, 723 F.3d 670, 674 & n.2 (6th Cir. 2013) (accepting appellate jurisdiction by ignoring the "factual disputations" and "ruling on what [wa]s properly before us [while] say[ing] nothing about what [wa]s jurisdictionally not before us"). That is, we must "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue,

obviating the need to dismiss the entire appeal for lack of jurisdiction." *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (deciding based on the plaintiff's record facts).

By ignoring the defendant's attempts to dispute the facts, we follow the same path as did the district court—considering the sufficiency of the plaintiff's proffered evidence, drawing all reasonable inferences in the plaintiff's favor—and, ideally, we would need look no further than the district court's opinion for the pertinent facts and inferences. *DiLuzio*, 796 F.3d at 611. Sometimes, we can simply adopt the district court's recitation of facts and inferences. *See Johnson*, 515 U.S. at 319. Of course, in briefing or arguing for reversal on legal grounds, the defendant-appellant may—indeed, for some arguments, must—point to some other of the plaintiff's proffered evidence, or some incontrovertible record evidence, to support that argument. *See, e.g.*, *Scott*, 550 U.S. at 380; *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011). Alternatively, or correspondingly, the plaintiff-appellee may point to additional record evidence in support of its position, or to bolster the district court's determination. Thus, while we need not engage in a plenary review of the record, neither are we limited to only the facts, evidence, or inferences that the district court has stated expressly. *See Estate of Carter*, 408 F.3d at 310 (relying on the "facts as alleged by the Estate"). Rather, we must make the legal determination of whether the defendant violated a clearly established right, based on those now (for this purpose) undisputed record facts, i.e., "once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott*, 550 U.S. at 381 n.8 (emphasis omitted). Moreover, our respect for the district court's factual determinations is such that, if the district court has cited no facts or evidence (e.g., has "simply den[ied the] summary judgment motion[] without indicating [its] reasons for doing so"), we "may have to undertake a cumbersome review of the record to determine what facts the district court . . . likely assumed." *Johnson*, 515 U.S. at 319 (quoted with approval in *Behrens*, 516 U.S. at 313).

It bears mention, however, that, in determining the relevant set of facts for the purpose of deciding an interlocutory appeal, we do not ourselves make any findings of fact or inferences for purposes of any subsequent proceedings. *DiLuzio*, 796 F.3d at 611; *see also Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010) ("Whether [the plaintiff] is ultimately able to prove the alleged

factual bases for his claims is a matter left for the finder of fact [on remand]—not the appellate court on interlocutory appeal."); *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) ("Appellate courts review district court judgments; we do not find facts.").

Finally, upon establishing interlocutory jurisdiction over the qualified-immunity aspect of the appeal, we are frequently presented with questions of our pendent appellate jurisdiction.  *See McDonald v. Flake*, 814 F.3d 804, 816 (6th Cir. 2016); *DiLuzio*, 796 F.3d at 616.  Simply put, "[p]endent appellate jurisdiction may be exercised only when the immunity issues absolutely cannot be resolved without addressing the nonappealable [pendent] issues."  *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 752 (6th Cir. 2015) (editorial marks omitted) (quoting *Archie v. Lanier*, 95 F.3d 438, 443 (6th Cir. 1996)); *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998) (emphasizing that "pendent appellate jurisdiction is not meant to be loosely applied as a matter of discretion; rather, such jurisdiction only may be exercised when the appealable issue at hand cannot be resolved without addressing the nonappealable collateral issue").

### III.

Based on the foregoing, we have jurisdiction over the defendants' claims to qualified immunity and can proceed to the merits of those arguments.  We find that we do not, however, have interlocutory jurisdiction over the remainder of the defendants' claims on appeal.

### A.

The defendants argue that the district court erred by denying them qualified immunity on Bunkley's claims of false arrest and malicious prosecution.  The defendants concede that the right to be free from arrest or prosecution without probable cause is clearly established and argue that they did not violate this right or that they are nonetheless entitled to qualified immunity.

### 1.

Officers Dennis, Tanguay, and Washington argue that *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003), and *Saad v. Keller*, 546 F. App'x 552, 559 (6th Cir. 2013), hold that officers are entitled to qualified immunity when simply following orders, and,

therefore, they are entitled to qualified immunity for the false arrest because they were merely executing Sergeant Lucas's order to arrest Bunkley.  In *Anthony*, the Second Circuit actually said:

> We hold that [the] Officers . . . are entitled to qualified immunity for their seizure of Anthony.  In addition to the circumstances of which [the] Officers . . . were aware from their receipt of the 911 dispatch [based on a woman's claiming to be at risk of physical injury from Anthony] and their personal observations inside the apartment [of the woman who had called 911, where they found Anthony sitting 'uncommunicatively'], it is undisputed that [the] Officers . . . were responding to the order of a superior officer, Sergeant Mendez, to seize Anthony and remove her to the hospital.  '*Plausible* instructions from a superior or fellow officer support qualified immunity where, *viewed objectively in light of the surrounding circumstances*, they could lead *a reasonable officer to conclude* that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances).' *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000)[].

*Anthony*, 339 F.3d at 138 (emphasis added).  This decision does not support the contention that arresting officers are necessarily entitled to qualified immunity merely because they were "simply following orders."  It does not say anything like that.  Instead, it describes a situation in which "reasonable officers" could conclude that they have probable cause for an arrest based on "plausible instructions" from a supervisor when "viewed objectively" in light of their own knowledge of the surrounding facts and circumstances.  That did not happen here.

Here, Officers Dennis, Tanguay, and Washington assumed that Bunkley and his father were the Ainsworth shooters, even though neither fit Ainsworth's description (other than their both being African-American and Bunkley's wearing black clothing); they did not investigate the Knox shooting; and they did not even question Bunkley about the Ainsworth shooting before arresting him—they told him he was being arrested for a parole violation, which they knew was a lie.  "Viewed objectively," a jury could find that these officers under these circumstances had no *reasonable* belief that they had probable cause to arrest Bunkley.

The officers fare no better with *Saad v. Keller*, 546 F. App'x at 552, the other case they cite for their proposition that officers are entitled to qualified immunity when simply following orders.  The situation there was that the arresting officers arrived in the middle of a struggle between the responding officer and the plaintiff (Saad), and because the responding officer told

them Saad had shoved him, they effectuated the arrest.  *Id*. We granted qualified immunity because Saad failed to show, or even argue, that the late-arriving officers knew or should have known that Saad had not actually shoved the responding officer—and, therefore, there was no probable cause—explaining:

> [The officers], all of junior rank to Officer Keller, arrived at the Saad home after [Saad allegedly shoved Officer Keller].  Although the facts taken in the light most favorable to the Saads [i.e., Saad's claim that he did not actually shove Keller] support that Officer Keller knew that the warrantless entry and arrest was illegal, the dispositive inquiry to determine whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  The Saads' response to the Officers' motion for summary judgment addressed only Officer Keller's conduct and version of the events.  The Saads neither argued nor cited record evidence from which it could be inferred that it would have been clear to any of these junior Officers that the entry into the Saad home and Saad's arrest were unlawful, or that these Officers had reason to question their superior Officer's directive to enter the Saad home and arrest Saad.
>
> This leaves Sergeant Skelton, the ranking Officer, who was the last to arrive at the scene.  Sergeant Skelton testified that Reserve Officer Nason told him that Saad had shoved Officer Keller.  He testified that he assumed that Officer Keller had a legal basis to enter the home and that Saad's arrest was supported by probable cause.  As with the junior Officers, the Saads neither argue nor cite record evidence to support that it would have been clear to Sergeant Skelton that entry into the Saad home and Saad's arrest were unlawful.

*Id.* at 559 (citations omitted).  This is not a blanket holding that arresting officers are entitled to qualified immunity because they were "simply following orders."  This is an unremarkable recognition that a plaintiff cannot prevail on a claim for which he has produced no evidence whatsoever upon which a juror could rule in his favor.

**2.**

The other false-arrest defendant, Sergeant Lucas, was not actually present at the hospital for the physical arrest, but instead received information by phone from Officers Dennis, Tanguay, and Washington, and then instructed them to arrest Bunkley.  Lucas argues that he is entitled to qualified immunity because "there is no evidence that his order to arrest [Bunkley] . . . was unreasonable, plainly incompetent or knowingly violative of the law."

The district court proceeded from an inference that Lucas knew what Dennis, Tanguay, and Washington knew—that is, Lucas was informed of the pertinent facts and circumstances leading to and surrounding Bunkley's arrest. To the extent that Lucas is arguing that this factual inference is mistaken or that the evidence would be insufficient for Bunkley to prevail at trial, we are not at liberty to entertain that argument in this appeal. *See McDonald*, 814 F.3d at 812. And, if instead, Lucas is arguing that Bunkley's evidence, with inferences viewed most favorably to Bunkley, *see id.* at 813, does not state a legal violation, we have already recited repeatedly herein the evidence that Bunkley has proffered upon which a jury could reasonably find that these officers, including Lucas, knew there was no probable cause for his arrest.

### 3.

On the malicious prosecution claim, Investigator Moses argues that she is entitled to qualified immunity because Ainsworth identified Bunkley in the photo array and Moses "was required by law to do nothing else after probable cause was established by Ms. Ainsworth's identification of [Bunkley] as one of her assailants." But, as the district court explained, Moses did more than merely accept the photo-array identification, deem it probable cause, and provide it to the prosecutor. Moses knowingly withheld Bunkley's Facebook alibi. She also withheld from the prosecutor that Ainsworth had rejected the Knox photo array because the men were too old, meaning that Moses had no lead on the second assailant, certainly not one who had been shot.[3] And she falsely stated that: (1) Bunkley and Knox arrived at the hospital together, whereas, in truth, Knox had arrived alone in an ambulance and Bunkley had arrived later on foot; (2) Knox refused to turn over the bullets that wounded him, whereas there were no bullets because the shots had gone cleanly through his legs; and (3) hospital security detained Bunkley until the police could arrest him, whereas Bunkley was sitting idly in the waiting area when the police arrested him. A jury could conclude that these facts undermine a reasonable belief that Moses had established probable cause to prosecute Bunkley or that the photo-array identification was alone sufficient.

The district court properly denied qualified immunity on each of these claims.

---

[3]The warrant packet included information that Ainsworth could not positively identify Knox from the photo array.

### B.

The arresting officers argue that the district court erred by denying qualified immunity on Bunkley's claim that they failed to intervene in a wrongful arrest.[4] The district court held that "[t]he officers here were on notice that they had a duty to intervene to prevent violations of [Bunkley]'s constitutional rights, and the case law shows that this duty clearly extends to unlawful arrests and detentions." *Bunkley*, 2017 WL 4005919, at *9. The officers argue that *Williams v. Crosby*, 43 F. Supp. 3d 794 (N.D. Ohio 2014), holds that this right (to have an officer intervene to prevent a wrongful arrest) was not clearly established in the Sixth Circuit:

> Plaintiffs urge a duty to intervene . . . at an exceedingly high level of generality. In fact, the within-Circuit cases on which Plaintiffs rely reveal an officer has a duty to intervene to prevent fellow officers from summarily punishing (i.e., beating) a detainee. Even if [the officer's] failure to release [the plaintiff] is a constitutional violation, it was not clearly established under Circuit precedent in September 2012. [The officer] is entitled to qualified immunity on the unlawful arrest claim.

*Williams*, 43 F. Supp. 3d at 802 (citation omitted).

But the district court here rejected *Williams* as lacking reasoning and relied instead on the longer analysis in a more recent district court opinion explaining the Sixth Circuit standard:

> As for whether the right to intervention by officers to prevent unlawful arrest was clearly established in 2012, the [c]ourt finds in the affirmative. The [c]ourt agrees with the Deputy Defendants at the outset that these claims generally arise from an alleged used of excessive force. In determining whether a right is clearly established for purposes of qualified immunity, this [c]ourt is to look first to the United States Supreme Court, then to decisions of the Sixth Circuit and other courts therein, and finally to the decisions of other circuits.
>
> The Deputy Defendants appear to also be correct that the United States Supreme Court has not spoken to the issue of whether failure to intervene extends beyond

---

[4]We recognize that this claim might be redundant as to some or all of these officers inasmuch as we have already held that a jury could find them liable for actually committing a wrongful arrest. But it remains possible that, upon considering all of the evidence presented at trial, the jury could find that a certain officer or officers did not actually participate in the arrest but were nonetheless at fault for failing to intervene in the wrongful arrest. Moreover, "the plaintiff is the master of the complaint and may proceed on [his] preferred cause of action." *Hamilton Cty. Emer. Commc'ns Dist. v. BellSouth Telecomm. LLC,* 852 F.3d 521, 532 (6th Cir. 2017). Therefore, we leave it to Bunkley to choose his preferred cause of action.

the excessive force context.  The Sixth Circuit has.  In *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) (per curiam), the appellate court held that

> a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law.  Acts of omission are actionable in this context to the same extent as are acts of commission.

*Ross*, 482 F.2d at 36-37.  It matters not whether the individual violating the constitutional rights of a citizen is a fellow officer or a superior.

> In *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), the Sixth Circuit relied on *Ross* in holding that an officer could be liable for failing to intervene in an excessive force case.  That same year, the appellate court concluded in a case alleging illegal search and seizure and unlawful arrest and detention in violation of the Fourth Amendment that officers who are present at the scene of a violation of another's civil rights and who fail to stop the violation can be liable under § 1983.  Nearly twenty years later, the Sixth Circuit applied *Bruner* to another action involving unlawful seizure.  *See Jacobs v. Village of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001).  In *Jacobs*, the court observed, referencing *Bruner*, that officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights.  The Sixth Circuit went on to cite the Second Circuit's holding in *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994), in which the court found that an officer who fails to intercede is liable for the acts of other officers where he observes or has reason to know (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official.  At least two district courts in [the Sixth] Circuit have adopted the theory of liability articulated in *Anderson*.  The latter involved an alleged failure to intervene in an unlawful arrest.

> Based on the foregoing, as there are questions of fact with respect to the Deputy Defendants' liability for failure to intervene in their arrests, the motion of the Moving Plaintiffs for summary judgment on those claims is DENIED. Moreover, the Deputy Defendants are not entitled to qualified immunity.

*Holloran v. Duncan*, 92 F. Supp. 3d 774, 794-95 (W.D. Tenn. 2015) (footnotes, quotation marks, editorial marks, and certain citations omitted).  Another district court passage, relying on (and quoting) the same cases from the Sixth Circuit, *Jacobs*, 5 F. App'x. at 394-95, and the Second Circuit, *Anderson*, 17 F.3d at 557, states the same thing somewhat more succinctly:

Law enforcement officials have a duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers.  An officer who fails to intervene:

> is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official.

To be liable, an officer must have had a realistic opportunity to intervene to prevent the harm from occurring.  Generally the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury unless, based on all the evidence, a reasonable jury could not possibly conclude otherwise.

*Kaylor v. Rankin*, 356 F. Supp. 2d 839, 850 (N.D. Ohio 2005) (quotation marks and citations omitted).

The duty of law enforcement officers to intervene to prevent an arrest not supported by probable cause was stated in precedent "clear enough that every reasonable official would interpret it to establish" this rule.  *See District of Columbia v. Wesby*, 583 U.S. --, 138 S. Ct. 577, 590 (2018) (deciding a defendant's appeal from the denial of qualified immunity on claims of arrest without probable cause).   And the arresting officers here—Dennis, Tanguay, and Washington (and Lucas)—knew that they had not investigated the Knox shooting at all, knew that Knox and Bunkley did not reasonably match the descriptions that Ainsworth had given them, knew that they did not question Bunkley (or Knox) before arresting him, and knew that Bunkley did not have a probation violation (their asserted reason for arresting him).  They identified Bunkley, left the room to call Lucas, and returned to arrest Bunkley.  Any of these officers had time to stop, intervene, and prevent this arrest-without-probable-cause.

Based on Sixth Circuit law, the court properly denied qualified immunity.

## C.

Finally, we consider our jurisdiction over the defendants' other claims.  The defendants' four other arguments ask us to "reverse the denial of summary judgment."  Their reasons are: (1) Issue I—the defendants' proof of probable cause entitles them to summary judgment on the

false arrest claim; (2) Issue II—Moses's proof of probable cause and Bunkley's lack of proof that she influenced the decision to prosecute entitles her to summary judgment on the malicious prosecution claim; (3) Issue IV—the defendants' proof of their good faith, discretionary actions, within the scope of their authority entitles them to state law immunity; and (4) Issue V—the defendants proved that they could not have known to intervene and stop the arrest because, when Sergeant Lucas "ordered the . . . arrest, [] no other defendant was in a position at the time to determine there was no probable cause."  It is noteworthy that all four arguments depend on this court's accepting the defendants' evidence as being more persuasive than the district court found it to be, and more persuasive than Bunkley's counterargument.

Such routine denials of summary judgment, based on the district court's findings of genuine questions of material fact for decision by a jury, are neither appealable final decisions under 28 U.S.C. § 1291 on their own, nor qualified-immunity decisions immediately appealable as collateral orders.  *Hopper v. Plummer*, 887 F.3d 744, 760-61 (6th Cir. 2018).  This court can consider and decide these challenges only if it has "pendent appellate jurisdiction," which requires that these challenges are "inextricably intertwined" with the collateral (qualified-immunity) analysis properly before us; "in other words, only when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well."  *Id.* (quotation marks omitted).

Given that even collateral-order-based appellate jurisdiction does not cover these factual disputes, an appellate court cannot resolve them during the qualified-immunity analysis, much less as pendent to it.  That is, for the qualified-immunity appeal, this court must accept Bunkley's version of the facts—and ignore or omit the defendants' proffered factual disputes—so as to render the claims questions of law.  We do not decide such disputes of fact.

We have no jurisdiction, pendent or otherwise, over these fact-based challenges.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court as to the denial of qualified immunity, and DISMISS the remainder of the appeal for lack of jurisdiction.