UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN KEITH, | ) | Case No.: 1:18 CV 47 |
| Plaintiff | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| G. MICHELE YEZZO, *et al.*, | ) | |
| Defendants | ) | ORDER |

Currently pending before the court are Motions to Dismiss from Defendants Ohio Attorney General Mike DeWine ("Attorney General") (ECF No. 14), Ohio Bureau of Criminal Investigation ("BCI") (ECF No. 17), Crawford County Prosecutor's Office and Matthew Crall ("Crall") (ECF No. 18), Daniel Cappy and John Lenhart ("Cappy and Lenhart") (ECF No. 21), Michael Corwin, City of Bucyrus, and Bucyrus Police Department ("Police Department") (ECF No. 24), and G. Michele Yezzo ("Yezzo"). (ECF No. 32.) For the following reasons, the court grants Defendants' Motions to Dismiss.

## I. BACKGROUND

On January 8, 2018 Plaintiff Kevin Keith ("Keith" or "Plaintiff") filed this civil action against multiple Defendants, including Ohio Attorney General Mike DeWine, Ohio Bureau of Criminal Investigation, Crawford County Prosecutor's Office and Crawford County Prosecutor Matthew Crall, Daniel Cappy, John Lenhart, Michael Corwin, Bucyrus Police Department, and G. Michele Yezzo, pursuant to 42 U.S.C. § 1983, alleging federal constitutional deprivations stemming from the investigation, prosecution, and Keith's conviction of murder in May 1994. (Compl., ECF No. 1.)

**A. Factual Allegations**

On February 13, 1994, six people were shot, and three fatally wounded, in an apartment in Bucyrus, Ohio. (*Id*. at ¶ 16). Officers arrested Keith for the murders on February 15, 1994. (*Id*. at ¶ 25.) Keith was convicted of three counts of aggravated murder in May 1994, and was sentenced to death. (*Id*. at ¶¶ 25, 94.) Governor Strickland commuted Keith's sentence on September 2, 2010, citing "real and unanswered questions" in the case against Keith. (*Id*. at ¶ 114.)

Of relevance to this case are three issues, each related to evidence that linked Keith to the crime.

*1. Alleged Failure to Respond to a Subpoena Issued During Trial*

The first issue arises from an allegation that the Bucyrus Police Department failed to respond to a subpoena issued during Keith's trial. The day after the shooting, Richard Warren, one of the surviving victims, told a nurse, Amy Gimmets, that the shooter's name was "Kevin." (*Id*. at ¶ 23.) At a motion to suppress hearing, Captain Stanley testified that after he learned this information from Amy Gimmets, he called Warren and gave him a name lineup of four last names. (*Id*. at ¶ 52.) Warren picked "Keith." (*Id*.) Keith's attorney questioned Captain Stanley about police call log procedures, including why there was not a recording of this call. (*Id*. at ¶ 53.) Keith's motion to suppress testimony was ultimately denied. (*Id*. at ¶ 54.) The same day, presumably to receive more information about the calls between Warren, Captain Stanley, and Amy Gimmets, Keith's attorney issued a subpoena to the Custodian of Records of the Bucyrus Police Department for "all records, including radio dispatch logs of all call-ins from February 12, 1994 to the present time." (*Id*. at ¶ 55.) Plaintiff alleges the Police Department deliberately ignored the subpoena and never responded. (*Id*. at ¶¶ 68, 70).

*2. Alleged Failure to Respond to Public Records Requests Made Post-Conviction*

The second issue is based on an allegation that the Bucyrus Police Department failed to timely disclose call logs and phone records requested by Keith after his conviction. During the trial, John Foor, another nurse assigned to Warren, testified that Warren wrote "Kevin" on a piece of scrap paper after Foor asked if he could identify the shooter. (*Id*. at ¶ 57.) Although Foor subsequently threw out the piece of paper, Foor stated that he called the police around 5:00 a.m. on February 14, 1994 to report this information. (*Id*. at ¶¶ 58, 59.) In the years after his conviction, Keith pursued the Police Department phone records to confirm Foor's call. (*Id*. at ¶ 62.) The Police Department denied Keith's public records requests. (*Id*. at ¶ 62). The Bucyrus Police Department was eventually forced to produce Keith's requested call logs in February 2010, as a result of an unrelated lawsuit for failing to comply with public records requests. (*Id*. at ¶ 64.) At this time, Keith learned that nothing in the radio logs indicated any call from Warren's nurses to the police. (*Id.*)

*3. Yezzo's Allegedly Unreliable Forensic Analysis and Questionable Behavior*

The third issue is related to the alleged misconduct of former forensic analyst Michele Yezzo, the analyst in Keith's case, who had a history of troubling behavior during her tenure at BCI. For years before and after Keith's case, as well as during the investigation in Keith's case, BCI documented concerns that Yezzo's "findings and conclusions regarding evidence may be suspect. . . . She will stretch the truth to satisfy a department." (*Id*. at ¶¶ 80–88.) Some time in 1993, Yezzo served a 10-day suspension as a result of a disciplinary investigation. (*Id*. at ¶¶ 89–90.) After Yezzo's return, but before the follow-up hearing to determine the extent of disciplinary action, (*Id*. at ¶ 91), the Bucyrus shooting occurred and Yezzo issued a report regarding evidence in Keith's case.

After the shooting on February 13, 1994, police took tire and license plate impressions as a result of an eyewitness stating that she saw the perpetrator speed off in a cream-colored car that subsequently got stuck in a nearby snowbank. (*Id*. at ¶¶ 18–19.) Officers impounded a blue-green car on March 5, 1994, that Keith's girlfriend Melanie Davison drove because it had a license plate number whose last three digits matched the three digits recovered from the license plate impression. (*Id*. at ¶¶ 32–33.) The tire-track impressions collected from the scene did not match the tires on Davison's car when it was impounded. (*Id*. at ¶ 35.) However, on March 9, 1994, Captain Corwin of the Bucyrus Police Department faxed Yezzo a receipt for the type of tires purchased by Davison the previous year, along with a brochure picture of the tires. (*Id*. at ¶ 37.) Corwin included a handwritten note directing Yezzo to which picture represented the tires Davison put on the car, and added "hope this will do the trick for us." (*Id*. at ¶¶ 36–37.) Without physically examining any tire, Yezzo concluded that the tires in the brochure picture were similar to the tire tracks at the scene. (*Id*. at ¶ 38.) Based on photographs of the license plate from the impounded car and photographs of the license plate impression, Yezzo also concluded that the license plate impression had "spacing and orientation similar to the license plate" on Davison's car. (*Id*. at ¶¶ 39–40.)

On May 12, Yezzo testified to the tire-track and license plate conclusions via deposition. (*Id*. at ¶ 41.) Her deposition testimony was admitted as evidence in Keith's trial as part of the prosecution's case in chief. (*Id.*) BCI continued to monitor Yezzo's behavior throughout this time and to reprimand her for her behavior. (*Id.* at Ex. 12.)

After his conviction, but still without knowledge of Yezzo's reputation, Keith retained expert William Bodziak in September 2009, to review Yezzo's testimony. (*Id*. at ¶ 102.) Keith made two public records requests to BCI for all records pertaining to his case to give to Bodziak. (*Id*. at ¶¶ 103,

107.) BCI denied Keith's public records requests both times. (*Id*. at ¶¶ 105, 107.) On May 19, 2010, the Office of Governor Strickland requested that Attorney General Cordray provide Keith with the documents in his public records requests. (*Id*. at ¶ 108.) The Attorney General's office produced the documents, but did not provide Yezzo's personnel file. (*Id*.at ¶ 109.) On July 7, 2010, Bodziak rendered his conclusions, and they contradicted Yezzo's conclusions and testimony regarding the tire-track and license plate impressions. (*Id*. at ¶ 111.) Although Keith provided Bodziak's report to the Crawford County Prosecutor and an Assistant Attorney General, the Crawford County Prosecutor and the Attorney General used Yezzo's forensic conclusions from her trial testimony and report before a hearing of the parole board in August 2010. (*Id*. at ¶¶ 111–12). On August 19, 2010, the parole board recommended Keith be denied clemency. (*Id*. at ¶ 113.) Governor Strickland commuted Keith's death sentence thirteen days before Keith's execution date, citing the "forensic evidence about which important questions have been raised." (*Id*. at ¶ 114.)

### 4. Prior Appeals of Keith's Conviction

Keith has a lengthy and unsuccessful history in challenging his conviction. Before Keith was aware of any of the above issues, Keith directly appealed his conviction and sentence. (*Id*. at ¶ 95.) The Ohio Supreme Court affirmed both. (*Id.*) Keith unsuccessfully pursued state post-conviction relief with the state trial and appellate courts, until the Ohio Supreme Court ultimately declined to accept jurisdiction on appeal. (*Id*. at ¶ 96.) In 1999, Keith also filed an unsuccessful federal habeas petition with a federal district court. (*Id*. at ¶ 97.) The Sixth Circuit later affirmed the district court's denial of habeas relief on appeal. (*Id*. at ¶¶ 97–98.)

On May 11, 2010, after receiving the call log information from the Bucyrus Police Department in response to public records request made post-conviction, Keith filed for a motion for

relief from judgment and a new trial in state court on the basis that the logs demonstrated violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), because the records of the calls were destroyed. (*Id*. at ¶ 65.) Every state court denied his motion and the Supreme Court of the United States denied certiorari on April 1, 2013. (*Id*. at ¶ 147.)

On August 8, 2013, Keith filed a federal habeas petition in federal district court based partly on Bodziak's findings, which contradicted Yezzo's conclusions and testimony. (*Id*. at ¶ 151.) Because Keith's petition was successive to his first federal habeas petition from September 1999, the district court granted the Attorney General's motion to transfer Keith's case to the Sixth Circuit. (*Id*. at ¶¶ 152–53.) The Sixth Circuit denied Keith's motion for authorization to file a second or successive petition. (*Id*. at ¶ 154.)

After Keith's counsel learned of Yezzo's troubling behavior some time in 2016, Keith filed for leave to file a delayed motion for a new trial on October 23, 2016, based on the newly discovered evidence of Yezzo's personnel file. *(Id*. at ¶¶ 118–19, 137.) Lower courts denied his motion, and on December 6, 2017, the Ohio Supreme Court declined jurisdiction to hear the case on appeal. (*Id*. at ¶ 149.)

### B. Procedural History

Keith now comes before this court, alleging constitutional violations under 42 U.S.C. § 1983. Count I claims a violation of his right of access to the courts under the First and Fourteenth Amendments, and the Privileges and Immunities Clause of Article IV. (Pl's Opp'n 9, ECF No. 27) (citing *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997)). Keith bases this claim on Defendants' failure to disclose Yezzo's troubling behavior and her unreliable forensic work, as well as the alleged failure to produce call logs by Defendants Corwin, Bucyrus Police Department, and

the City of Bucyrus. (*Id*. at ¶¶158–59, 162–63.) Keith argues that Defendants' failure to disclose information about Yezzo's conduct before the expiration of his time to file a timely post-conviction petition or new trial motion required him to face the additional procedural obstacle of first obtaining leave to file his claims. (*Id*. at ¶ 161.) Similarly, Keith alleges that Defendants Corwin, Bucyrus Police Department, and City of Bucyrus' failure to produce the call logs (1) in compliance with his trial attorney's subpoena that was issued after Captain Stanley's suppression hearing testimony, and (2) in a timely response to Keith's subsequent records requests regarding John Foor's call to the police precluded Keith from demonstrating the Police Department acted in bad faith in destroying the call logs and recordings. (*Id.* at ¶¶ 162–65.) Thus, when Keith again files a federal habeas petition, he will be required to first obtain authorization to file a successor petition. (*Id*. at ¶¶ 163–64.) Keith alleges that these violations amount to a denial of his right to access the courts.

Count II alleges a general violation of Keith's rights under the Fifth and Sixth Amendments, including the rights of due process, fair trial, and confrontation. (*Id*. at ¶¶ 166–76.) This claim is related to the alleged withholding of evidence in Count I, but further claims, among other things, that Defendants were deliberately indifferent to Keith's constitutional rights when they (1) failed to adequately supervise Yezzo, (2) failed to restrain Yezzo from testifying in Keith's case, and (3) continued to rely on Yezzo's forensic report in official proceedings with knowledge that her tests may be suspect and that there were concerns about her credibility generally. (*Id*. at ¶¶ 168–72, 174–76.) Keith prays for this court to order that the forensic evidence be evaluated by a fair and impartial forensic analyst and asks that it waive all procedural arguments precluding consideration of Keith's claims on the merits, in addition to providing nominal, compensatory, and punitive damages and attorney fees as remedies. (*Id.* at 31.)

Defendants have separately filed Motions to Dismiss for failure to state a claim on various

grounds (ECF Nos. 14, 17, 18, 21, 24, 32.) A common argument in each of Defendants' Motions is that Keith has failed to state a claim upon which relief can be granted because his claims are not cognizable under § 1983.

## II. LEGAL STANDARD

The court examines the legal sufficiency of Plaintiff's claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993). The United States Supreme Court clarified the law regarding what a plaintiff must plead in order to survive a motion made pursuant to Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009).

When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court, in *Iqbal*, further explained the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a

"context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. LAW AND ANALYSIS

A plaintiff may bring a § 1983 civil action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States..." 42 U.S.C. § 1983. Thus, to establish a prima facie case under the statute, a plaintiff must assert that the (1) person (2) was acting under color of state law; and (3) deprived him or her of the rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

The threshold determination in § 1983 cases that intersect with the federal habeas statute, 28 U.S.C. § 2254, is whether the claims are cognizable. *Heck v. Humphrey*, 512 U.S. 477, 480–82 (1994). In *Heck v. Humphrey*, the United States Supreme Court made it clear that when "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction and sentence [in a § 1983 case] . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487; *see also Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (finding a prisoner's claim was not cognizable under § 1983 because a judgment for the plaintiff would necessarily imply the invalidity of good-time credits and shorten the duration of prisoner's confinement); *Preisser v. Rodriguez*, 411 U.S. 475, 488–90 (1973) (finding certain claims are not cognizable under § 1983 and must instead be brought in habeas corpus proceedings). In *Heck*, the Court found that the plaintiff's claims regarding a *Brady* violation necessarily implicate the invalidity of a conviction so the claims were not appropriate under § 1983.

-9-

*See Heck*, 512 U.S. at 487. This habeas exception to § 1983 cases holds regardless of the remedy requested. *See Heck*, 512 U.S. at 481–82. Even though a suit for monetary damages cannot be brought through federal habeas proceedings, § 1983 action is not appropriate when "establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction." *Id.*

However, recent Supreme Court cases have read the habeas exception to § 1983 claims more narrowly. *See Skinner v. Switzer*, 562 U.S. 521 (2011) (finding that a state prisoner may seek post-conviction DNA testing of crime scene evidence pursuant to a state law because a resulting DNA test would not necessarily disturb the prisoner's conviction); *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) (allowing prisoners to challenge the constitutionality of state parole procedures since a successful claim would not necessarily demonstrate the invalidity of confinement or its duration). Where success in the suit "would not necessarily imply the invalidity of his conviction" because "results might prove exculpatory, [but the] outcome is hardly inevitable," the Court has allowed the claim to proceed under § 1983. *Skinner*, 562 U.S. at 534.

With these principles in mind, the court will consider each of Keith's claims.

### A. Right of Access to the Courts

In reading the *Heck* line of cases, the "determining question is whether success on the claims asserted in Keith's § 1983 action would 'necessarily demonstrate the invalidity of his conviction.'" *Wilkinson v. Dotson*, 544 U.S. at 81–82. Keith argues that if he is successful on his claims, it "would only result in a new trial" if he was able to make additional showings that this lawsuit does not address (Pl.'s Opp'n 7, ECF No. 27.) Since a new trial is not an automatic reversal nor would it necessarily shorten the duration of his confinement, Keith asserts that his claims should not be barred by the holding in *Heck*. (*Id.*)

A right of access to the courts requires a plaintiff to "identify a 'nonfrivolous,' 'arguable'

underlying claim." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citations omitted). Notably, Keith contends that he satisfies this underlying claim element by identifying "nonfrivolous *Brady* and *Youngblood* claims." (Pl.'s Opp'n 9–10, ECF No. 27.) This would put his case squarely within the parameters of *Heck*. *See* 512 U.S. at 479, 487 (finding an action for damages complaining that officers "knowingly destroyed" evidence necessarily implies the invalidity of the plaintiff's conviction or sentence). To sidestep *Heck*, Keith cites a number of cases from district courts in the Ninth Circuit for the proposition that a plaintiff can establish individual elements of a right of access claim "without necessarily implying the invalidity of his incarceration." (Pl.'s Opp'n 10, ECF No. 27) (quoting *Sprinkle v. Robinson*, 2017 WL 1079833, at *7 (E.D. Cal. Mar. 22, 2017).) Even if it is possible, in some circumstances, to separate the mere *identification* of an underlying claim from a *determination* of the underlying claim's affect on a conviction, *Heck* holds that it is not possible when the underlying claim is a *Brady* violation. *Heck*, 512 U.S. at 483–87. Consequently, Keith has failed to state a claim for which relief can be granted. The court dismisses this claim.

### B. Fifth and Sixth Amendments

Keith maintains that *Heck* is inapplicable to his claim. (Pl.'s Opp'n 5, ECF No. 27.) Rather, the totality of the facts demonstrate that Defendants "more broadly violated his constitutional rights to due process." (*Id.* at 8.) To distinguish his case from *Heck*, he seeks to align his claims with those found viable in *Skinner v. Switzer*, 562 U.S. 521 (2011). (Pl's Opp'n 5, ECF No. 27). In *Skinner v. Switzer*, the plaintiff sued for injunctive relief under § 1983 challenging Texas' post-conviction DNA statute "as construed" by the Texas courts. 562 U.S. at 529–30. The United States Supreme Court found his claim cognizable because "[s]uccess in his suit for DNA testing would not necessarily imply the invalidity of his conviction. . . . While test results might prove exculpatory, that outcome is hardly inevitable." *Id.* at 534. Keith contends that, like the plaintiff in *Skinner*, he is asserting

Defendants' conduct post-conviction violated his constitutional rights. (Pl.'s Opp'n 6, ECF No. 27.) These include relying on Yezzo's opinions in fighting to uphold Keith's convictions and death sentence during his appeals, and refusing his request to retest the evidence. (*Id.*) Therefore, like in *Skinner*, there is no concern that these cases would "spill over to claims relying on *Brady*," which are alleged pretrial unconstitutional actions. *Skinner*, 562 U.S. at 536.

Keith's characterization of his claim is not well-taken. In fact, it contradicts the legal and factual assertions made in Keith's complaint. (Pl.'s Opp'n 5–6, ECF No. 27.) Although it is true that some of Keith's allegations challenge Defendants' post-conviction conduct, Keith explains he is also challenging Defendants' actions that occurred before his criminal trial. (*Id.*) ("Keith is challenging the constitutionality of the Defendants' actions in: (1) knowingly affecting the findings of and testimony of a forensic analyst to implicate Keith; (2) providing inculpatory forensic conclusions and testimony against Keith, when those conclusions and testimony were influenced by bias and not based on evidence. . . .".)

Even if this court were to view only the allegations of unconstitutional activity that occurred post-trial, the post-trial/pretrial distinction is merely a disguise for what is, at essence, a *Brady* claim, which *Heck* prohibits under § 1983. The plaintiff in *Skinner* brought a procedural due process challenge against the Texas courts' interpretation of a state statute that prevented him from getting DNA evidence from his criminal case tested. *Skinner*, 562 U.S. at 529–30. The constitutional violation that the plaintiff alleged not only occurred after his conviction, but was wholly unrelated to the procedures from his trial. The United States Supreme Court then found that if the plaintiff was successful in his case, it would only result in getting DNA evidence from his trial tested. *Id*. at 534. Since this would not automatically result in the reversal of his conviction, it was permissible. *Id*. Other Supreme Court and Sixth Circuit § 1983 cases that survived a habeas exception defense have

followed the same analysis. *See Wilkinson v. Dotson*, 544 U.S. 74 (2005) (finding success in a challenge to parole eligibility requirements would result in the Court only declaring the requirements invalid and, at most, in a new parole hearing for the plaintiff, not an overturned conviction); *Hill v. Snyder*, 878 F.3d 193 (6th Cir. 2017) (holding that a successful challenge to policies and procedures governing access to prison programming and parole eligibility might lead to increased programming or hasten the time to appear before a parole board, but would not result in the decreased duration of a sentence); *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007) (finding a successful claim of retaliation against a prisoner that resulted in the prisoner losing good-time credits would only shorten the prisoner's time required until he could appear before a parole board, and would not automatically reduce his time in confinement). In each of these cases, the courts concluded that a successful ruling on the alleged violation would not result in the automatic reversal of a conviction, but the plaintiffs in each of these cases had also alleged post-trial unconstitutional conduct unrelated to their convictions. In contrast, Keith is claiming that Defendants' withholding of Police Department phone logs and Yezzo's personnel file, as well as Defendants' continued reliance on this evidence, violated his constitutional rights. The specific constitutional violations Keith alleges stem from trial. Even if the alleged constitutional violations persist post-conviction, they are all directly related to the procedures from his trial. Therefore, success on his claims would not mean a mere retesting of evidence or an eventual opportunity for a new trial. It would mean that a court would first be required to making some finding that conduct from Keith's trial violated his constitutional rights. This would necessarily implicate the invalidity of Keith's conviction in contravention of the holding in *Heck*. Therefore, this court must dismiss this claim.

## IV. CONCLUSION

For the foregoing reasons, the court grants Defendants' Motions to Dismiss (ECF Nos. 14, 17, 18, 21, 24, 32.) Because we find that Keith cannot bring either of his claims under 42 U.S.C. § 1983, we do not address Defendants' other arguments.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

September 28, 2018